# PARK CONSTRUCTION COMPANY v. INDEPENDENT SCHOOL DISTRICT NO. 32, CARVER COUNTY.[1]

## No. 32,440.

### January 17, 1941.

[1]Reported in 296 N. W. 475.

*O. A. Brecke* and *E. T. Chesnut,* for appellant.

*W. F. Odell,* for respondent.

STONE, JUSTICE.

Plaintiff appeals from an order sustaining defendant's general demurrer to the complaint.

In December, 1938, defendant contracted with plaintiff to grade an athletic field. The contract required that "all questions" subject to arbitration thereunder "shall be submitted to arbitration at the choice of either party." Another provision was that "such decision [of the arbitrators] shall be a condition precedent to any right of legal action." The contract did not name the arbitrators but provided for their selection in the event that arbitration was demanded by either party.

Work under the contract progressed until August of 1939, when, dispute having arisen, plaintiff demanded arbitration of five issues. An arbitration resulted, the three arbitrators having been selected pursuant to the contract. Defendant objected to any arbitration on the grounds that there was "no foundation laid for arbitration" and that four of the stated issues were "not matters proper for arbitration" under the specifications.

Notwithstanding such objection, there was a completed arbitration with an award to plaintiff, for the recovery of which this action is brought. All matters designated in plaintiff's demand "were fully tried and submitted to the arbitrators." So we consider that there was no revocation of the agreement to arbitrate.

■ There is much argument whether this arbitration was intended to be under statute or common law. If the former, the award is summarily reviewable and enforceable under 2 Mason Minn. St. 1927, § 9516, rather than by suit on the award. But if the proceeding was under the common law, this action lies on the award. From the complaint, we have difficulty in saying what was the original intention. On that point the contract is not clear. There is material for argument either way. But some months after the contract was signed came the submission. It was

executed by a full hearing before the arbitrators and their decision. The decisive thing is that in the submission, hearing, and award the parties intended and accomplished what was a common-law arbitration. The agreement for arbitration and the proceedings in pursuance to it failed in so many respects to meet the requirements for statutory arbitration under 2 Mason Minn. St. 1927, § 9513, *et seq.*, that it is impossible to suppose an intention to proceed thereunder. In what the parties did finally, as distinguished from what at the outset they agreed to do, there was plainly no thought of statutory as distinguished from common-law, arbitration.

The statute authorizing arbitration, 2 Mason Minn. St. 1927, § 9513, declares that "nothing herein shall preclude the arbitration of controversies according to the common law." So the case comes to just this. There was actual submission, full hearing, and award. All was the action of competent parties. They got the result intended and for which they had the right to contract. Because of their competence and the lawful nature of both means and end, it would be sheer caprice for us to nullify the whole proceeding.

In Holdridge v. Stowell, 39 Minn. 360, 40 N. W. 259, it was held that where a controversy has been submitted to arbitrators and it is clear that a statutory arbitration was the thing intended, but the statute has not been obeyed, the proceeding cannot have effect as a common-law submission. That proposition has had the best reconsideration of which we are capable.

This is a problem concerning which there has been much judicial disagreement. The then leading cases on both sides were considered in the Holdridge case. The reasoning adopted in that decision was taken from Sargent v. Inhabitants of Hampden, 32 Me. 78. The gist of it is this. The report (of the arbitrators) "cannot be treated as an award at common law, without annulling the agreement of the parties, and substituting in its place a new and different contract."

At that determinative point we disagree with the thesis that a completed arbitration, not complying with the applicable statute, cannot be sustained under the common law, where, as here, the statute so plainly preserves the common-law right of arbitration. Our deferential submission is that even though the initial agreement of the parties contemplated a statutory arbitration, they have not thereby lost their right later to proceed under the common law.

So, even though first intention was to stick to the statute, if later they have set up a common-law arbitration, the parties themselves have annulled their first agreement for a statutory proceeding. Their own effective action has substituted one at common law. We just cannot discover why we have any right to thwart such a legitimate purpose so lawfully accomplished. Insofar as Holdridge v. Stowell, 39 Minn. 360, 40 N. W. 259, runs counter to the foregoing, it is overruled.

■ The question has been raised whether the determinative contract, insofar as it provides for arbitration of all disputes, is void as against public policy. Possibly by a restrictive construction of the provision for arbitration, we might avoid decision of the question of law. We elect not to do so.

The historical and only basis for the opinion that executory agreements to arbitrate all issues to arise under a contract are void, as against public policy, is open to serious question. There is eminent authority (Lord Campbell, in Scott v. Avery, 25 L. J. [N. S. Exch.] 308, 313), that the rule was the product of judicial jealousy rather than judicial reasoning. He said that it arose in the time when "the emoluments of the Judges depended mainly, or almost entirely, upon fees." In those days they had no fixed salary and so "there was great competition to get as much as possible of litigation into Westminster Hall, and a great scramble * * * for the division of the spoil." In consequence, "they had great jealousy of arbitrations * * * Therefore they said that the Courts ought not to be ousted of their jurisdiction, and that it was contrary to the policy of the law to do so."

To that doctrine, its questionable origin aside, there are two destructive objections.

First, there appears never to have been any factual basis for holding that an agreement to arbitrate "ousted" jurisdiction. It has no effect upon the jurisdiction of any court. Arbitration simply removes a controversy from the arena of litigation. It is no more an ouster of judicial jurisdiction than is compromise and settlement or that peculiar offspring of legal ingenuity known as the covenant not to sue. Each disposes of issues without litigation. One no more than the other ousts the courts of jurisdiction. The right to a jury trial, even in a criminal case, may be waived. So, also, may the right to litigate be waived. Such waiver may be the result of contract or unilateral action.

"The decision by arbitration is the decision of a tribunal of the parties' own choice and erection." Daniels v. Willis, 7 Minn. 295, 303 (374). The tribunal is one that they have a legal right to erect. That being so, what self-justification can judges assert for nullifying such rightful choice? In the field of industry, a chorus of deserved derision would silence declaration that a collective bargaining agreement for arbitration of future issues was violative of public policy.

Second, if there ever was public policy against agreements to arbitrate, it has disappeared. Now the policy of this state, as declared by the legislature, 2 Mason Minn. St. 1927, § 9513, *et seq.,* and applied by this court, Daniels v. Willis, 7 Minn. 295 (374), and Larson v. Nygaard, 148 Minn. 104, 108, 180 N. W. 1002, favors arbitration.

Public policy, where the legislature has spoken, is what it has declared that policy to be. So far as the question of policy is concerned, our statute settles the matter. It not only establishes the process of statutory, but confirms that of common-law, arbitration.

Here again our conclusion opposes that of many earlier decisions of this court. Insofar as they have ruled that a general agreement to arbitrate all differences to arise under a contract is

contrary to public policy and therefore void, they are overruled. They include: Gasser v. Sun Fire Office, 42 Minn. 315, 44 N. W. 252; Whitney v. National Masonic Acc. Assn. 52 Minn. 378, 54 N. W. 184; Aaberg v. Minnesota Com'l Men's Assn. 152 Minn. 478, 189 N. W. 434; Abramowitz v. Continental Ins. Co. 170 Minn. 215, 212 N. W. 449; Glidden Co. v. Retail Hdwe. Mut. F. Ins. Co. 181 Minn. 518, 233 N. W. 310, 77 A. L. R. 616. They are disapproved notwithstanding their accord with a prevailing view of decision law elsewhere. Restatement, Contracts, § 551.

For this departure from a doctrine of long standing, we make no apology. To us, the reasons assigned are so compelling as to allow no other course. It is enough that the legislature has declared for arbitration, both statutory and common-law. That fixes the policy of this state for, rather than against, arbitration. The apology should be rather for the regrettable fact that our decision law did not promptly reflect the legislative declaration.

■ No rights of property involved, nor rule of practice, the American doctrine of *stare decisis* is guiding policy, not inflexible rule.[2] 14 Am. Jur., Courts, § 124, *et seq.* It is no shield for plain error. Neither does it bar coördination of legal philosophy with that of new and commanding facts. Such coördination is necessary in order to satisfy the imperative demand for realistic judicial treatment of issues in their own actual environment rather than a synthetic one made from the materials of discarded doctrine. Particularly, it can have no restraining effect when, as here, an earlier policy of decision law is opposed to a later rule declared by statute.

---

[2]Therein it differs somewhat from the more inexorable English rule. See Gardner, "A Comparison of the Doctrine of Judicial Precedent in American Law and in Scots Law," 26 Am. Bar Assn. Journal, 774. This searching review shows how, of necessity, from the very nature of the judicial process, decisions tend to become law. Even in civil law, the inescapable force of precedent, as law, is felt and recognized. "In modern French law there is now a very considerable body of *jurisprudence constante,* or case law, which is observed in practice, although it seems theoretically opposed to the intention of the code." *Id.* 776.

The sound conservatism of our regard for judicial precedents has done much in the promotion of what democracy knows as civil liberty. To its frank recognition of the fallibility of judges, to the fact that it does not so shackle the judicial mind as to prevent self-criticism, with resulting disclosure and correction of error, decision law owes its forward view and much of its progress. Not only have judges sought out and corrected their own errors; also, and on occasion, their criticism or suggestions have resulted in the repeal or amendment of an outmoded or incongruous statute. For such reasons, the policy of *stare decisis* is not only of "the tissue of our law," Melin v. Aronson, 205 Minn. 353, 357, 285 N. W. 830, 832, but also that element of its life blood which assures continued vigor and growth.

■ So long as an award of arbitrators is enforceable by action, it is automatically subject to enough of court review. In a proper case, there is no reason why an award should not be sustained in part and rejected in part. 3 Am. Jur., Arbitration and Award, § 134. This may be such a case, for the award of the arbitrators to themselves of what seems to be excessive compensation,[3] is so obviously severable from the award as between the litigants that it may be subject to separate consideration and correction. This feature illustrates a danger to which parties may subject themselves by arbitration. If so, it is their concern. It is for them, by appropriate action, to protect against such abuse, either before or after the fact. It is not for the courts to. destroy the whole structure of their lawful agreement and conduct in order to rid it of one minor, severable, and objectionable result.

For the stated reasons, we conclude that the complaint set forth a cause of action on the award. Therefore we reverse the order sustaining the demurrer.

Order reversed.

---

[3] The self-determined fees of the arbitrators were $300 each, a total of $900. The award was $1,544.74.

PETERSON, JUSTICE (dissenting).

Defendant contended that the contract stipulated for a statutory arbitration under 2 Mason Minn. St. 1927, § 9514, which would have brought the arbitration under the supervision of the court as we held in Holdridge v. Stowell, 39 Minn. 360, 40 N. W. 259. Although it admitted that the contract called for a statutory arbitration, plaintiff claimed that it was entitled to proceed as at common law because of the failure of the parties to execute a submission under § 9514. Defendant refused to arbitrate altogether except under the statute. It refused to arbitrate at common law. That was an effective revocation of any agreement to arbitrate at common law. But it did under a reservation of rights participate in the arbitration which was conducted according to the common law. The reservation of rights preserved defendant's right to object to a common-law arbitration. Below the only question was as it is here, whether defendant was bound by the award made over its objection.

The discussion of the several propositions of law involved, except the one that the contract to arbitrate was void as against public policy, will assume that the contract to arbitrate was legal and in all respects binding on the parties.

■ For purposes of clarity, it ought to be remembered that the word "revocation" is used with different meanings as Lord Justice Bowen pointed out in In re Smith & Service and Nelson & Sons, L. R. 25 Q. B. D. 545, at p. 553. Sometimes it refers to the revocation of the authority of the arbitrator, which is a true revocation. It is sometimes used in the sense of refusing to perform, which is a revocation only in the sense that the arbitrator's authority is revoked as an incident to the nonperformance, but which in reality is a breach of the contract to arbitrate. The one relates to the relation between the party and his appointee and the other to that between the parties to the contract. While the word is used with the two meanings, the distinction has been observed in practice; and, while the courts have held that a party had the "right" to "revoke" a submission, it is clear that they intended to

refer simply to the power to break a binding contract for which breach there was a judicial remedy such as the recovery of damages. Red Cross Line v. Atlantic Fruit Co. 264 U. S. 109, 44 S. Ct. 274, 68 L. ed. 582; People ex rel. Union Ins. Co. v. Nash, 111 N. Y. 310, 18 N. E. 630, 2 L. R. A. 180, 7 A. S. R. 747; Call v. Hagar, 69 Me. 521; Vynior's Case, 4 Coke, Part VIII, 81b; Milne v. Gratrix, 7 East, 608; Newgate v. Degelder, 2 Keble, 10; Annotation, 47 L.R.A.(N.S.) 408.

■ It makes no difference for present purposes whether or not defendant was within its rights in insisting on a statutory arbitration. The fact is that it refused to arbitrate at common law. Such refusal prevented the making of an award which was binding on defendant, although the refusal might be held to be a breach of the contract to arbitrate. This conclusion follows from the propositions (1) that the authority of an arbitrator may be revoked by the party granting it so long as it remains executory or before award made and (2) that an award made after revocation of the authority of an arbitrator is not binding on the party making the revocation.

These propositions are settled by our decisions in Holdridge v. Stowell, 39 Minn. 360, 40 N. W. 259, and M. & St. L. Ry. Co. v. Cooper, 59 Minn. 290, 61 N. W. 143, 144.

The Cooper case was a proceeding in eminent domain to condemn land for a railroad right of way. During the trial of the appeal to the district court from the commissioners' award the parties agreed to submit the controversy to named arbitrators, whose decision or award was to be final and binding on the parties, and continued the trial from day to day pending the making of an award by the arbitrators. Before an award was made, but after the arbitrators had met, heard evidence, and agreed upon the amount of their award, the landowner "served notice of revocation of his agreement to submit to arbitration." In spite of the revocation the arbitrators made an award upon which judgment was entered *nunc pro tunc* as of the date of the agreement to submit to arbitration. We held that the award and the judgment entered

thereon was void. Mr. Justice Mitchell said [59 Minn. 294]: "However desirable for certain reasons it might be to sustain the judgment appealed from, it is impossible to do so consistently with well-settled legal principles," for the reason that the common-law submission to arbitration "was revocable at any time before award made." Here the refusal to arbitrate at common law revoked any authority to proceed to arbitration. Hence the award here was void and afforded no grounds for relief.

While it is apparent that Mr. Justice Mitchell stated the well settled rule, he did not bother to cite much authority. Nor would such citation be necessary here if it were not for the fact that the decision is contrary to well settled rules.

(a) An arbitrator's authority may be revoked before award for the simple reason that any authority without an interest is subject to revocation by the party granting it. Allen v. Watson, 16 Johns. (N. Y.) 205; Rochester v. Whitehouse, 15 N. H. 468; Lessee of Dixon v. Morehead, 1 Addison (Pa.) 216; Annotation, 47 L.R.A.(N.S.) 400, *et seq.;* 3 Am. Jur., Arbitration and Award, § 31, note 13, citing some 57 cases, 16 annotations, and the Restatement, Contracts, § 551(1). The English cases are collected in 1 Halsbury, Laws of England (2 ed. Hailsham) pp. 633-634, § 1081.

An arbitrator has been held to be an "agent," Hays v. Hays, 23 Wend. (N. Y.) 363, 367; People ex rel. Colo. Bar Assn. v. Lindsey, 86 Colo. 458, 473, 283 P. 539; Wilkinson v. Prichard, 145 Iowa, 65, 123 N. W. 964, Ann. Cas. 1912A, 1259; Babb v. Stromberg, 14 Pa. 397, 399 (*per* Chief Justice Gibson); Grosvenor v. Flint, 20 R. I. 21, 37 A. 304; 1 Halsbury, Laws of England (2 ed. Hailsham) pp. 633-634, § 1081; an appointee, In re Curtis and Castle Arbitration, 64 Conn. 501, 511, 30 A. 769, 42 A. S. R. 200; a "mandatory," People ex rel. Union Ins. Co. v. Nash, 111 N. Y. 310, 316, 18 N. E. 630, 2 L. R. A. 180, 7 A. S. R. 747; and the arbitrators have been held to be a mere private tribunal and not a court, since only the sovereign may establish a court by law. The establishment of a court is beyond the power of the citizen. Meacham v. Jamestown, F. & C. R. Co. 211 N. Y. 346, 105 N. E.

653, Ann. Cas. 1915C, 851 (concurring opinion of Cardozo, J.); Doleman & Sons v. Ossett Corp. [1912] 3 K. B. 257, 269. In Farrington v. Hamblin, 12 Wend. (N. Y.) 212, 214, Mr. Chief Justice Savage said: "The arbitrators were not officers of the court, but judges of the parties' own choosing." It was held in In re Curtis and Castle Arbitration, 64 Conn. 501, 30 A. 769, 42 A. S. R. 200, that arbitrators are "appointees" of the parties and not officers of the court, although the submission was made under a rule of court. In In re Fraser & Co. and Ehrensperger & Eckenstein, L. R. 12 Q. B. D. 310, 317, Brett, M. R. said: "He [an arbitrator] is not a judge, but an arbitrator, and therefore is a mandatory deriving his authority from the parties who nominate him." Willes, J., in In re Rouse & Co. and Meier & Co. L. R. 6 C. P. Cas. 212, 217, said that the authority of an arbitrator stood upon the same basis as an "agent without an interest." There may, of course, be cases where an arbitrator like any other agent has an agency coupled with an interest and hence irrevocable. Tayler v. Marling, 2 Man. & G. 55. *Contra* is the single case of Collins v. Oliver, 4 Humph. (Tenn.) 439, which cites no authority and is out of line with the settled rule. It ignores the fundamental principles involved in cases of this kind. The conclusion there reached is unsound.

Blackstone regarded arbitration as a species of redress by mere act of the parties as distinguished from redress by operation of law or judicial action. 2 Blackstone, Bk. 3, pp. 15-17. Chitty's notes show that authority of the arbitrators was regarded as delegated power, which from its very nature was revocable.

While an arbitrator is an agent, he is one of a special kind. His agency is to judge, not to advocate. He is bound to act judicially as between the parties with all which that implies. Produce Ref. Co. v. Norwich Union F. Ins. Society, 91 Minn. 210, 97 N. W. 875, 98 N. W. 100; Strong v. Strong, 9 Cush. (63 Mass.) 560; Norwich Union F. Ins. Soc. Ltd. v. Cohn (10 Cir.) 68 F. (2d) 42, 94 A. L. R. 494; Annotation, 94 A. L. R. 499, *et seq.* But he is not a judge, Utah Const. Co. v. Western Pacific Ry. Co. 174 Cal.

156, 162 P. 631; his award is not a judgment under the full faith and credit clause of the federal constitution, Foote v. Newell, 29 Mo. 400; and prohibition does not lie to him as a court. In re Fidelity & Deposit Co. v. Woltz, 234 App. Div. 823, 253 N. Y. S. 583.

The leading case is of course Vynior's Case, 4 Coke, Part VIII, 81b, 82a, in which Lord Coke used the much quoted language:

"For a man cannot by his act make such authority, power, or warrant not countermandable, which is by the law and of its own nature countermandable; as if I make a *(a)* letter of attorney to make livery, or to sue an action, &c. in my name; or if I assign auditors to take an account; or if I make one my factor; or if I submit myself to an arbitrament; although these are made by express words irrevocable, or that I grant or am bound that all these shall stand irrevocably, yet they may be revoked."

All the modern cases trace the rule of revocability to Vynior's Case.[4] The rule has been said to be too well established to admit

---

[4]Attempts have been made to upset the rule by attacking Lord Coke's statement of the rule in Vynior's Case as a dictum contrary to authority.

The action was in debt on a bond to secure performance of an "irrevocable" agreement to arbitrate. The defense was no award. The rejoinder was that the failure of an award was due to defendant's revocation of the arbitration, which in itself constituted a breach of the bond for which plaintiff was entitled to recover. In stating the grounds of decision Lord Coke pointed out that, while the defendant had the power according to well settled principle to revoke the authority of the arbitrator, plaintiff was entitled to recover not for the revocation, but on the bond. The holding was therefore germane as showing the basis of the decision. The case was decided before the Statute of Fines and Penalties and when the obligee was entitled to recover the full penal sum on a bond for a breach of condition and not merely his actual damage.

It is claimed that the rule was settled by the authorities contrary to what Lord Coke stated it to be. Cohen in his "Commercial Arbitration and the Law" has essayed this task in Chapter IX entitled "The Earlier Precedents Contra to Coke's Dictum." The authorities which he cites fall into classes: (1) those involving executed awards, such as the three cases cited from Bracton and those from Y. B. 8 Edw. IV, 8 and 9; (2) those involving the manner and means of revocation, such as the case from

of dispute. People ex rel. Union Ins. Co. v. Nash, 111 N. Y. 310, 18 N. E. 630, 2 L. R. A. 180, 7 A. S. R. 747, and the celebrated decision in Tobey v. County of Bristol, 3 Story, 800, by Mr. Justice Story.

(b) At common law an award made after revocation of the authority of the arbitration was not binding on the party making the revocation. This rule announced in our decisions in M. & St. L. Ry. Co. v. Cooper, 59 Minn. 290, 61 N. W. 143, and Holdridge v. Stowell, 39 Minn. 360, 40 N. W. 259, is supported by authorities too numerous to cite and which are collected in the texts and annotations. 5 C. J. pp. 53-54, §§ 92-94; 6 C. J. S., Arbitration and Award, § 33; 3 Am. Jur., Arbitration and Award, § 59; Annotation, 47 L.R.A. (N.S.) 441-442.

■ The decision in this case is perhaps the only one of record in which it is held that a party after performance has been stopped may proceed with performance of an executory contract. In effect the holding is that in the case of an executory contract to arbitrate future controversies one party may by resort to a sort of self-help complete the arbitration after the other has refused to perform. Two reasons have already been stated why this cannot

Y. B. 49 Edw. III, pl. 14, holding that an authority by deed must be revoked by deed, and from the Y. B. 28 Hen. VI, 6, holding that an authority given by two persons could be revoked only by the action of both of them; (3) those in which the terms of the bond or stipulation were not set forth except that the party agreed to perform the award, in which, while admitting the party had a right to revoke, the court took an award to determine the amount due on the bond such as the cases from Y. B. 49 Edw. III, 8 and 9, 5 Edw. IV, 4 and 4.3, and 18 Edw. IV, 9; and (4) a case involving an action in debt holding that an award after revocation of the arbitrator's authority is not binding on the party, Y. B. 21 Hen. VI, 30a.

So far from showing that Lord Coke did not, as claimed, know his common law, the citations affirmatively show that he did. The cases involving executed authorities or revocation after award do not raise the question of revocation of an executory authority. There can be no question that there can be no revocation in such cases. See Red Cross Line v. Atlantic Fruit Co. 264 U. S. 109, 44 S. Ct. 274, 68 L. ed. 582; Restatement, Contracts, § 550, comment a. Cases involving the method of revocation and in which the court held that, while the authority might be revoked, an award

be done, *viz.,* the revocability before award made of a contract for a submission and the fact that an award after such revocation is not binding. The rule offends two more fundamental concepts, *viz.,* that a contract to arbitrate a future controversy is not specifically enforceable and that a party has the power to break such a contract.

Where a contract is broken a party's remedies are such as the law affords. The remedy for breach of contract to arbitrate a future dispute is the recovery of compensable damages. Annotation, 47 L.R.A.(N.S.) 408.

A defendant who has broken the contract to arbitrate by refusing to perform is not precluded from defending the action and insisting that plaintiff is entitled only to damages for the breach of contract. In Thomas W. Finucane Co. v. Board of Education, 190 N. Y. 76, 82 N. E. 737, the court overruled plaintiff's objection to evidence of any affirmative defense upon the ground that defendant had failed to comply with the terms of the contract to arbitrate, and held that plaintiff's remedy for the breach of contract was redress by damages and that defendant was not precluded from asserting his defense.

---

might be made under the bond, which was irrevocable, are not in point. Such bonds were taken, as Lord Coke pointed out, for the very reason that they were irrevocable and recovery could be had on them, when no recovery could be had for a substantial sum for the revocation of the authority. See 2 Blackstone, Bk. 3, pp. 15-17. These authorities are in harmony with the rule as stated by Lord Coke. The only authority in point is that cited from Y. B. 21 Hen. VI, 30a, which fully supports the rule of Vynior's case.

These authorities are reviewed by Sayre in "Development of Commercial Arbitration Law," 37 Yale L. J. 595, at pp. 602, 603, who points out that Lord Coke not only stated the rule as it was in his day and that the authorities fully supported his view, but that March, who wrote in 1648, and Kyd in their treatises cited these and other authorities, including Vynior's Case, in support of the rule stated in Vynior's Case.

It would be strange indeed if the rule had not been as Lord Coke stated it to be. The doctrine that an authority may be revoked is well nigh universal. Annotation, 47 L.R.A.(N.S.) 400. In cases of agency it is not questioned. 1 Dunnell, Minn. Dig. (2 ed. & Supps.) §§ 225 and 226.

Specific performance of such contracts will not be decreed. People ex rel. Union Ins. Co. v. Nash, 111 N. Y. 310, 18 N. E. 630, 2 L. R. A. 180, 7 A. S. R. 747; Tobey v. County of Bristol, 3 Story, 800; Annotation, 47 L.R.A.(N.S.) 364; 3 Am. Jur., Arbitration and Award, § 74, note 12; Restatement, Contracts, § 550, comment *a*.

A person may break a contract by stopping performance. Gibbons v. Bente, 51 Minn. 499, 53 N. W. 756, 22 L. R. A. 80; Southworth v. Rosendahl, 133 Minn. 447, 158 N. W. 717, 3 A. L. R. 468; 2 Dunnell, Minn. Dig. (2 ed. & 1932 Supp.) § 1799; 12 Am. Jur., Contracts, § 386, note 13. A contract to arbitrate future disputes is no exception to the rule. Chippewa Lbr. Co. v. Phenix Ins. Co. 80 Mich. 116, 44 N. W. 1055; Union Ins. Co. v. Central Trust Co. 157 N. Y. 633, 52 N. E. 671, 44 L. R. A. 227; Doleman & Sons v. Ossett Corp. [1912] 3 K. B. 257, at p. 271. It is quite immaterial here whether the view be adopted that the promisor's duty is to pay damages for the breach if he does not perform his contract, Holmes, "The Path of the Law," 10 Harv. L. Rev. 457, or that the promisor notwithstanding the duty to the promisee of performance has the power by breaking the contract, which in itself is wrongful conduct, to convert the duty into a liability for breach of contract thereby altering the duty of performance into a liability to pay damages for breach, Barbour, "The 'Right' to Break a Contract," 16 Mich. L. Rev. 106. The rule is that a party may refuse to perform and incur a liability for the breach of contract.

The decision that plaintiff had the right to perform through its own efforts gives effect to a sort of self-help heretofore unknown to the law and which overrides settled principles, which govern the rights and the remedies of the parties.

■ Agreements to arbitrate future disputes are not to be held irrevocable in the sense that they are incapable of breach and that they shall be subject to specific enforcement in all cases merely because the statute (2 Mason Minn. St. 1927, § 9513) provides that nothing therein shall preclude the arbitration of controversies according to the common law. Of course it is not to be overlooked

here that plaintiff has not even applied for a decree of specific performance but relies on self-help.

Statutes recognizing the validity of and in aid of common-law arbitration, which do not contain specific provisions that agreements to arbitrate future disputes shall be irrevocable, do not make such agreements irrevocable by implication. 1 Chafee and Simpson, Cases on Equity, p. 553; Annotation, 47 L.R.A.(N.S.) 432. Every state except two has such a statute. In Colorado and Washington such agreements have been held irrevocable under statutes providing for statutory arbitration. But in those states the statutes have been construed as excluding arbitration according to the common law. Our statute in express terms preserves the right to arbitrate at common law under which the right to revoke is implicit. Hence the rule in the two mentioned states is not in point here.

The long history of the subject shows that no case ever held and that no statute ever provided that an agreement to arbitrate future disputes shall be irrevocable prior to the New York Act of 1920, which in express terms so provided. In People ex rel. Union Ins. Co. v. Nash (1888) 111 N. Y. 310, 315, 18 N. E. 630, 2 L. R. A. 180, 7 A. S. R. 747, the court held that it would consider that such an agreement was revocable under New York statutes recognizing common-law arbitration "until its nature is changed by legal enactment." Mr. Justice Story after most elaborate consideration said, "Whenever arbitrations are made compulsive, it is by legislative authority," which at the same time provides safeguards to obtain full hearing and decision under the supervision of the courts. Tobey v. County of Bristol, 3 Story, 800, at p. 822. In New York the arbitration is compelled under the 1920 act by an order made on motion. In re Application of Berkovitz v. Arbib & Houlberg, Inc. 230 N. Y. 261, 130 N. E. 288.

It is to be remembered that we are still in midst of quite a controversy as to whether such agreements should be made irrevocable in all cases and what remedies should be provided. For example, some acts provide that the agreement shall be irrevocable and en-

forceable specifically as a matter of course, as in New York. Under such acts the courts are without discretion and power to pass on the merits of the particular case. Others provide that there shall be specific performance of such contracts but that it shall stand upon the same ground as specific performance of other contracts. Still others, as in England, provide that there shall be no specific performance, but that the court shall have the power to stay actions brought upon demands which the parties have agreed to arbitrate. The power to stay generally includes by express provision the power to hold that the stay should not be granted in the particular case. See Phillips, "The Paradox in Arbitration Law," 46 Harv. L. Rev. 1258; 50 A. B. A. Reports, pp. 135-162.

The history of the question in England is illuminating and persuasive because our statutory and decision law are based so largely on English law. The guiding principle there, which ought to be followed everywhere, was stated by Lord Justice Mellish in Randell, Saunders & Co. v. Thompson, L. R. 1 Q. B. D. 748, construing the English statutes, which lacked a provision that an agreement to arbitrate shall be irrevocable, where he said (p. 759) : "The legislature have not given this power; and if they had intended to enact that no agreement to refer should be revoked, *they might have said so in express terms.*" (Italics supplied.)

The first English act was that of 9 and 10 William III, c. 15 (1698), which provided that it shall be lawful for the parties to agree that their arbitration should be made a rule of a court of record. In Milne v. Gratrix (1806) 7 East, 607, 611, the parties made their agreement to arbitrate a rule of court, but before award defendant revoked the submission. Despite the revocation, the arbitrators, as here, proceeded to make an award. On order to show cause why defendant should not be found guilty of contempt in not paying the award, Lord Ellenborough, C. J., said that at common law such an agreement was revocable before award and that "there is nothing in that statute [9 and 10 William III. c. 15] to make it irrevocable while it continues executory," and held that the award was not binding on defendant. The court

indicated that the revocation after making the agreement to arbitrate a rule of court might be a contempt, but that fact did not affect the party's right to revoke. The rule was settled that a submission might be revoked, whether made a rule of court or not.

The next act was that of 3 and 4 William IV, c. 42, p. 355 (1833), which recited that it was considered "expedient" to make references to arbitration "more effectual" and provided that the authority of arbitrators should be irrevocable except by leave of court, where the agreement named the arbitrators and provided that it might be made a rule of court. This statute was construed as not rendering irrevocable an executory agreement to arbitrate as distinguished from a submission to named arbitrators. Mills v. Bayley (1863) 2 H. & C. 36; Thomson v. Anderson [1870] L. R. 9 Eq. 523, 531, 532. The cited cases hold that while it might be desirable to make such agreements irrevocable the legislature, having failed so to provide, the common-law rule of revocation remained in force.

Then by the British Common Law Procedure Act, 1854, § 17, it was provided that an agreement to arbitrate might be made a rule of court "unless such Agreement or Submission contain Words purporting that the Parties intend that it should not be made a Rule of Court." This statute was construed not as abolishing the common-law rule of revocation, but as enabling a party to make an agreement to arbitrate a rule of court, except in cases where the agreement to arbitrate or the submission excluded that right. In the case In re Rouse & Co. and Meier & Co. [1871] L. R. 6 C. P. Cas. 212, the effect of the three mentioned acts and the cases in which they were construed were considered. In the Rouse case one of the parties made the agreement to arbitrate a rule of court. After the arbitrators failed to agree the other party applied to the court for leave to revoke the submission. The court held that, since the statute provided that a submission but not an agreement to refer should be irrevocable where it was made a rule of court, it was competent for the party to revoke an agreement without such leave. Willes, J., said (p. 220) that to hold that the statute

intended such agreements to be irrevocable "would be legislating and not construing the statute."

The 1854 act contained a provision that the court might stay any action or proceedings, where the parties had made a valid submission. This provision was carried forward in the act of 1889, 52 and 53 Victoria, c. 49. This provision was construed as authorizing the court to stay, but not to specifically enforce, such an agreement. In Doleman & Sons v. Ossett Corp. [1912] 3 K. B. 257, 268, Fletcher-Moulton, L. J., said:

"It [the court] has under these provisions power to refuse its aid to a person who appeals to it in breach of an agreement to decide the matter by arbitration. * * * The law will not enforce the specific performance of such agreements, but, if duly appealed to, it has the power in its discretion to refuse to a party the alternative of having the dispute settled by a Court of law, and thus to leave him in the position of having no other remedy than to proceed by arbitration."

There has been other legislation in England since, but none which enables a party to proceed with an arbitration without the intervention of the judgment of a court where the other party refused to arbitrate or which authorizes any court to make such a judgment.

The legislature has declared the public policy with respect to the revocability of agreements to arbitrate. In two instances it has declared contracts to arbitrate irrevocable, one relating to present or existing disputes under 1 Mason Minn. St. 1927, § 9513 (statutory arbitration); the other in the determination of the amount of loss under insurance policies. Kavli v. Eagle Star Ins. Co. Ltd. 206 Minn. 360, 288 N. W. 723. In both instances a judicial procedure has been provided by the statute.

There is entire omission to declare an agreement to arbitrate at common law irrevocable. That the omission was intentional is apparent from the history of the statute. Our present statutes, with the exception of some amendments subsequently added which

are not material here, were enacted as L. 1849, c. 59. The statute as originally enacted authorized only a statutory arbitration. While it did not make statutory arbitration exclusive and abolish arbitration at common law, it was silent with respect to the matter. In 1852 an amendment in substantially the form of the present statute was adopted, which read: "Nothing in this chapter contained, shall preclude the submission and arbitrament of controversies according to the common law." R. S. 1851-1852, Amendments, § 98. There is the clearest expression of legislative intention, if there had been any doubt before, that there was to be optional arbitration under the statute or at common law. In Earle v. Johnson, 81 Minn. 472, 84 N. W. 332, and Holdridge v. Stowell, 39 Minn. 360, 40 N. W. 259, *supra,* we construed the statute as affording such option in harmony with the weight of reason and authority. Wald's Pollock on Contracts (3 ed.) p. 880.

By providing in the one statute that only the agreement shall be irrevocable and that the parties might arbitrate according to the common law under which such an agreement is revocable, there is a clear enumeration of the cases in which an agreement to arbitrate shall be irrevocable and the extent to which the statute shall be applicable. It is a case for the application of the maxim that the expression of one thing is the exclusion of another. Cohen v. Gould, 177 Minn. 398, 405, 225 N. W. 435. Any other construction does not make sense. If the legislature says that an agreement for a statutory arbitration shall be irrevocable, but that parties shall be free to contract for a common law arbitration which is revocable, just how can the latter be held to be irrevocable and harmonized with the rest of the statute?

Arbitration is authorized in cases involving state highway contracts by 1 Mason Minn. St. 1927, § 2554(17). The procedure is similar to that under fire insurance policies. It provides that in that case, after the arbitrators have been appointed, the parties shall execute a submission agreement and that if a party refuses or neglects to agree the arbitration shall proceed against him as by a default. That is the only statute which authorizes such a

procedure. Court decision, as here, should not in effect authorize it where the legislature has clearly indicated that it should not obtain.

Of course there can be no quarrel with the proposition that public policy is what the legislature has declared it to be. But where the legislature has spoken, as here, public policy is what it has been declared to be. The courts are the last institution to listen to or be influenced by "deserved derision" of any group; much less ought we even to take notice of such an argument. If we deserve derision, we ought to bear it, and not let it influence decision. The legislature has turned a pretty deaf ear to such pressure. By authorizing arbitration according to the common law the legislature intended that parties shall have the right to arbitrate subject to all the rules and incidents of arbitration at common law. One of these is the right of revocation. The majority by declaring all agreements to arbitrate to be irrevocable is administering not the policy as declared by the legislature, but one of its own making. When the judicial process is thus used to legislate and not to construe the law, I must protest.

Interested groups keep the pressure on in favor of arbitration. Arbitration "is rarely damned publicly." That it is not "an unfailing panacea for satisfactory resolution of business controversies" is being demonstrated by experience. Except in certain cases, arbitration is not as speedy, friendly, or effective as its champions claim. In the light of these facts, there is all the more reason why we should adhere to settled rules until the legislature shall enact a different rule. See Phillips, "A Lawyer's Approach to Commercial Arbitration," 44 Yale L. J. 31. The instant case with all its acrimony, delay, litigation, and expense ($900 for arbitrators' fees in addition to attorneys' fees and other expense of the parties to arbitrate a $3,300 claim) is not unlike many other similar cases cited by Mr. Phillips.

■ The question of the validity of the contract as one ousting the courts of jurisdiction deserves different treatment. The use of the word "oust" is unfortunate for the reason that it does not

convey the real thought. In this connection the word "oust" does not mean that the court is dispossessed of an action or anything of the sort. Everybody knows that. By treating the term in that sense as does the majority the whole idea is made absurd and ridiculous. Such treatment simply misconstrues the true meaning, avoids the question, and diverts attention from the real point.

An agreement "ousting" the court of jurisdiction is one that binds the parties not to resort to the courts to enforce their rights or for the protection of the law in the event of future possible dispute. In a literal sense one cannot be ousted unless he is in. Agreements of the kind mentioned really prevent a party from ever entering the courts (and that is their real vice) so that they can be ousted. The word "oust" is generally traced to the case of Kill v. Hollister [1746] 1 Wils. 129, and was probably used there only as judicial rhetoric. 37 Yale L. J. 604, note 27. In Fidelity & Casualty Co. v. Eickhoff, 63 Minn. 170, 65 N. W. 351, 352, 30 L. R. A. 586, 56 A. S. R. 464, in holding that a contract provision that a surety's voucher should be conclusive as to the fact and extent of defendant's liability was invalid as a contract ousting the courts of jurisdiction, Mr. Justice Mitchell said (pp. 178, 179):

"The right of a party to waive the protection of the law is subject to the control of public policy, which cannot be set aside or contravened by any arrangement or agreement of the parties, however expressed. * * * In the present case the attempt is to provide that, after the alleged cause of action has accrued, the plaintiff shall be the sole and exclusive judge of both its existence and extent. Such an agreement is clearly against public policy."

The case of Scott v. Avery, 5 H. L. 811, on which the majority leans so heavily, is at best a questionable authority. The decisions of the several judges not only indicate adherence to the doctrine that an agreement ousting the courts of jurisdiction is invalid, but take great pains to emphasize that the rule is to be maintained in its integrity. The holding simply is that the rule has no application where compliance with the contract, which ousts the court

of jurisdiction, is made a condition precedent to liability. See Czarnikow v. Roth, Schmidt & Co. [1922] L. R. 2 K. B. D. 478.

Lord Campbell assigns two separate origins, as if it were physically possible that there could be two separate origins of anything, to the rule, which he states are (1) the hostility of common-law judges to arbitration based on jealousy of their jurisdiction, and (2) the rule laid down in Co. Litt. 536, that an action was indispensable to obtain redress for waste in certain cases and that the wrong could not be "redressed by neighbours." Lord Campbell admits the validity of the second origin, which does not relate to arbitration at all. But he attacks the first as being founded in judicial jealousy.

Worst of all is the assertion that the rule could have the physically impossible two separate and disconnected origins. He does not even attempt to explain anything so absurd. Nor does he attempt to dispose of the second origin as a valid ground for sustaining the rule.

That the rule originated in judicial jealousy and contests for jurisdiction is both an inadequate and baseless reason. It is inadequate because it entirely ignores the substantive question of the merits of the rule somewhat like argument *ad hominem*. After all, the revelations incident to searching the origin of a rule of law may be quite as shocking as those in tracing a family tree. Is it not true that equity and assumpsit originated and had their growth under the very circumstances which Lord Campbell condemns? Common-law judges, like equity judges in their contest of a similar kind with common-law judges at an earlier period, made no pretense to conceal the fact that they were engaged in a contest with equity for jurisdiction in cases of assumpsit. Restatement, Restitution, pp. 4-10. See Ames, "The History of Assumpsit," 2 Harv. L. Rev. 1. If origin in judicial contest for jurisdiction were a ground for rejecting a rule, quasi contract and restitution would have to go. But these rules are praised for their merits. The development of assumpsit is hailed as an evidence of the common law's flexibility and power of self-develop-

ment. A good rule ought not to be condemned because of its bad origin.

Lord Campbell's assertion appears to be groundless. He does not substantiate his statement with any evidence or citation. The available evidence is against him. In 1648, which was just 40 years after the decision in Vynior's Case, and over 200 years before the decision in Scott v. Avery, 5 H. L. 811, March stated in his treatise on Slander and Arbitraments, p. 262, that the law seemed favorable to arbitration. Referring to the act of 1698, Blackstone said that the legislature encouraged arbitration because of "the great use of these peaceable and domestic tribunals." 2 Blackstone, Bk. 3, pp. 15-17.

The enforcement by common-law judges of contracts to arbitrate in the same manner as other contracts were enforced and of bonds given to secure performance of such contracts is a complete refutation of Lord Campbell's claim of judicial jealousy. Vynior's Case and the authorities which it cites illustrate the utter groundlessness of his assertion. If the courts wanted to put an end to agreements to arbitrate and thus terminate arbitration, the result could have been accomplished by simply declaring such contracts illegal as against public policy. Quite to the contrary, the courts recognized the validity of contracts to arbitrate and enforced bonds given to secure their performance. The remedy on the bond of recovery of the full face amount effectually enforced the agreement to arbitrate. The courts so far from showing hostility to arbitration did everything permissible under the then existing law to make it effective. 37 Yale L. J. 603.

If remedies for the enforcement of agreements to arbitrate and the bonds to secure performance of such agreements lost some of their effectiveness between the decision in Vynior's Case and that in Scott v. Avery, the result was due not to judicial hostility to arbitration, but to legislation. In 1697 the Statute of Fines and Penalties, 8 and 9, William III, c. 11, was enacted, under which a party could recover under a bond not the penal sum stipulated, but merely his actual damage. The statute was aimed

at all penalties and forfeitures and applied to bonds for the performance of agreements to arbitrate only because they came within such coverage. The effect of course was that a party was no better off with a bond than without one so far as concerned the amount which he was entitled to recover. A party suing on the bond had to allege and prove his actual damage resulting from the breach of the contract. Welch v. Ireland, 6 East, 613; Mayne, Damages (10 ed.) pp. 261-263; 5 C. J. p. 251, § 700, notes 15-18; 5 C. J. S., Arbitration and Award, § 148. Generally, parties could prove only nominal damages for breach of either the contract or the bond. 37 Yale L. J. 604. The rule after the statute accounts in large measure for the movement which began within a year after the statute was enacted to make agreements to arbitrate irrevocable and specifically enforceable. But to lay the effect of legislation to judicial hostility simply ignores the facts of history.

Later English cases, while adhering to the rule that an agreement to arbitrate an entire controversy as a condition precedent is valid, have emphasized the importance of enforcing the rule against contracts ousting the courts of jurisdiction. Czarnikow v. Roth, Schmidt & Co. [1922] L. R. 2 K. B. 478.[5]

[5]The views expressed are interesting as showing the necessity of some sort of judicial control over arbitration agreements.

Bankes, L. J., said (p. 484): "The ground of objection to the rule is that as an agreement it ousts the jurisdiction of the Courts of law, and is consequently against public policy and void. The importance of maintaining in its integrity the rule of law in reference to public policy is in my opinion a matter of considerable importance at the present time. Powerful trade organizations are encouraging, if not compelling, their members and persons who enter into contracts with their members to agree, as far as they can lawfully do so, to abstain from submitting their disputes to the decision of a Court of law. The present case is a case in point. There have been others before the Courts. Among commercial men what are commonly called commercial arbitrations are undoubtedly and deservedly popular. That they will continue their present popularity I entertain no doubt, so long as the law retains sufficient hold over them to prevent and redress any injustice on the part of the arbitrator, and to secure that the law that is administered by an arbitrator is in substance the law of the land and not some home-made law of the particular arbitrator or the

In this country Lord Campbell's views have not been accepted for the obviously adequate reason that there is as much reason for applying the rule against ousting the courts of jurisdiction in cases of conditions precedent as in those of conditions subsequent and mere collateral agreements. To say that parties do not intend to create an enforceable obligation where they expend large sums of money for labor and materials under a contract or for insurance, and that arbitration is to be a condition precedent to any rights rather than a mode of determination of such rights in case of possible future disputes, is to hold that the label and not the substance controls.

In his concurring opinion in Meacham v. Jamestown, F. & C. R. Co. 211 N. Y. 346, 352, 105 N. E. 653, 655, Ann. Cas. 1915C, 851, holding that an agreement to arbitrate in a foreign jurisdiction is void as against public policy, although the agreement to arbitrate was made a condition precedent to liability, Mr. Justice Cardozo aptly said of labelling the agreement to arbitrate as a condition

particular association. *To release real and effective control over commercial arbitrations is to allow the arbitrator, or the Arbitration Tribunal, to be a law unto himself, or themselves, to give him or them a free hand to decide according to law or not according to law as he or they think fit, in other words to be outside the law."*

Scrutton, L. J., in speaking of the provision for stating a case for the opinion of the court, said (p. 488): "In my view to allow English citizens to agree to exclude this safeguard for the administration of the law is contrary to public policy."

Atkin, L. J., called attention to the evils of entering into such contracts under pressure, saying (p. 491): "In the case of powerful associations such as the present, able to impose their own arbitration clauses upon their members, and, by their uniform contract, conditions upon all non-members contracting with members, the result might be that in time codes of law would come to be administered in various trades differing substantially from the English mercantile law. *The policy of the law has given to the High Court large powers over inferior Courts for the very purpose of maintaining a uniform standard of justice and one uniform system of law."* (Italics supplied.)

precedent: *"A rule would not long survive if it were subject to be avoided by so facile a devise."* (Italics supplied.)

In 3 Am. Jur., Arbitration and Award, § 35, notes 2 and 3, the text reads:

"In view of the conclusive effect of an award, it is uniformly held in those jurisdictions of the United States which adhere to the rule against agreements to arbitrate future disputes generally, that an executory agreement to submit to arbitration questions in difference which may later arise, involving substantive liability upon a cause of action which will then be complete in itself, is not taken out of the scope of the general rule *merely because the parties attempt by express language to make an award a condition precedent to suit.* Such language does not remove the objection that the agreement attempts to oust the jurisdiction of the courts, since at common law the effect of the agreement when once executed is the same whether such language is included or not, the cause of action then being upon the award, which has previously settled the question of liability." (Italics supplied.)

The Restatement, Contracts, § 551(1), states the rule as follows:

"A provision in a bargain that arbitration of the whole question of whether there has been a breach of contract shall be a condition of any right of action is illegal, but does not invalidate the remainder of the bargain."

The rule therefore is that an agreement to refer a whole cause of action to arbitration as a condition precedent to liability is nonenforceable as against public policy. W. H. Blodgett Co. v. Bebe Co. 190 Cal. 665, 214 P. 38, 26 A. L. R. 1070; Annotations, 47 L.R.A.(N.S.) 380, *et seq.,* and 26 A. L. R. 1083. The rule as stated is settled as the rule in this jurisdiction by the numerous cases which the majority proposes to overrule.

In Whitney v. National Masonic Acc. Assn. 52 Minn. 378, 54 N. W. 184, 185, we definitely rejected the rule of Scott v. Avery, 5 H. L. 811. In the Whitney case an action was brought on an

accident policy, which contained a provision for general arbitration as a condition precedent to liability. We said (p. 385):

"It has long been the settled rule of law that if, in a contract creating a definite legal obligation, *e. g.* to pay a certain sum of money on a specified contingency,) there is embodied an agreement that the rights or obligations of the parties shall be determined by arbitration, and that no action shall be maintained on the contract, such an agreement is not legally effectual to bar such an action. * * * In Scott v. Avery, 5 H. L. Cas. 811, and particularly in the opinion of Lord Campbell, is language which seems to be opposed to the rule as it had theretofore been established. * * * The rule is so well settled, and so generally recognized, that it is needless to consider the various reasons which have been assigned for it." See Insurance Co. v. Morse, 20 Wall. (U. S.) 445, 22 L. ed. 365.

In Aaberg v. Minnesota Com'l Men's Assn. 152 Minn. 478, 481, 189 N. W. 434, we refused to construe a provision to refer the entire case as meaning only the amount of loss as "mere evasion" of the rule.

In Lindahl v. Supreme Court I. O. F. 100 Minn. 87, 91, 110 N. W. 358, 359, 117 A. S. R. 666, 8 L.R.A.(N.S.) 916, we held a provision in a fraternal insurance policy void which provided that as a condition precedent to suit the beneficiary shall first exhaust all remedies within the order, including an appeal to its highest tribunal, which by its laws was to meet in a foreign country three years after the accrual of the plaintiff's claim. We said: "If the provisions are treated as providing for arbitration, they are subject to the objection that parties cannot be permitted to bind themselves in advance to submit claims which may arise in the future to arbitration, and thus oust the courts of their jurisdiction." This case demonstrates the need for some curbs on such contracts as a matter of public policies which the several judges emphasized in Czarnikow v. Roth, Schmidt & Co. [1922] L. R. 2 K. B. 478.

There is no valid reason for upsetting our established rule. Sound policy demands that we adhere to it.

■ Already reasons have been stated for not overruling Holdridge v. Stowell, 39 Minn. 360, 40 N. W. 259, 261. That parties were to have an option of arbitrating according to the common law or under the statute seems too clear to admit of argument. That the two forms are essentially different seems equally plain. Mr. Chief Justice Gilfillan's statement of the arguments in favor of the rule as laid down seems unanswerable. He said (pp. 362, 363):

"The cases which follow the rule adopted in 51 Mich. 135, (16 N. W. Rep. 310,) can be sustained only on the theory that, upon a submission to arbitration, the intention and agreement to submit are alone material, and that the mode selected by the parties is not material. Common-law arbitrations not being abolished by the statute, of course the parties may agree on either mode. The differences between the two modes, and the incidents attending them, are so great that, when they have agreed on one, it can hardly be said that, provided the arbitrator makes an award, it is indifferent to the parties whether one or the other has been followed. We will mention some of these differences. At common law either party may revoke the submission. The arbitrators need not be sworn. Witnesses before them need not be sworn, unless the agreement to submit so require. The arbitrators must hear the parties in the presence of each other. When the award is made, the authority of the arbitrators is terminated, and the only way to enforce the award is in an ordinary action, subsequently brought. Under the statute, neither party can revoke without the consent of the other. The arbitrators are required to be sworn, as are also the witnesses. Notice being given, the arbitrators may hear one party in the absence of the other. From the time of filing the award the proceeding is pending in and under the supervision and control of the court, which *may vacate* the award in certain cases, and in others modify or correct it, and, as the statute seems to contemplate, may recommit it to the arbitrators; and the

court enters judgment on the award, and the judgment will then stand as though entered in an ordinary action. *The right secured to the parties to have these requirements of the statute complied with, and to have the results which it attaches to the submission, is important. It may have been the sole inducement which led to the submission, rather than have the controversy left to an ordinary action. Where it is clear that the parties intended and supposed they were making a submission securing it, to hold them to a mode of submission which does not secure it would surely be to annul the contract they have intended to make, and substitute in its place a new and different one."* (Italics supplied.)

The importance of permitting parties to bargain for a particular kind of arbitration, and the reason for the rule as stated in the Holdridge case, is illustrated by the instant case. An arbitrator's decision under a common-law arbitration is final as to both the law and the facts. It has been said that an arbitrator is a law unto himself. That being so, very often his law is different from the law of the land—a sort of throwback from general and universal standards of justice according to law to the special rules of the particular arbitrator. Phillips calls attention to the situation in an article bearing the suggestive title—"Rules of Law or Laissez-Faire in Commercial Arbitration," 47 Harv. L. Rev. 590.

The court below heard this and another matter together and decided both matters by a single order in which he said that the award was not sustained by the evidence. For want of a record, the evidence is not before us. By 2 Mason Minn. St. 1927, § 9517(5), an award may be vacated where it is "contrary to law and evidence." See Borum v. M. St. P. & S. S. M. Ry. Co. 184 Minn. 126, 238 N. W. 4. That question may be raised on a motion to confirm the award. In the case of a common-law arbitration, the party has no similar safeguard. An action will lie on the award which is impeachable only for fraud or the equivalent. In the instant case, under a statutory arbitration defendant would have been entitled to have the award set aside, but not at common law.

The effect of the majority opinion is that one form of arbitration satisfies a contract for a different kind and that it is important only that there be an arbitration. In other words, the effect is that where the parties stipulate for arbitration with legal safeguards, one of the parties at the option of the other may be compelled to take a different form of arbitration lacking such safeguards. This denies the exercise of a legal right to elect the form of arbitration, which is conferred by statute, and, as we held in Holdridge v. Stowell, 39 Minn. 360, 40 N. W. 259, in effect makes a new contract for the parties. Franks v. Battles, 147 Ark. 169, 227 S. W. 32; Inhabitants of Deerfield v. Arms, 20 Pick. (Mass.) 480, 32 Am. D. 228; Cope v. Gilbert, 4 Denio (N. Y.) 347; Williams v. Walton, 9 Cal. 143; 3 Am. Jur., Arbitration and Award, § 8.

An agreement for a statutory or a common-law arbitration involves a choice of remedies authorized by law. Francis v. Ames, 14 Ind. 251.

Argument that a remedy lawfully selected by the parties is not a part of the contractual obligation deserves scant consideration in view of recent cases like Home B. & L. Assn. v. Blaisdell, 290 U. S. 398, 54 S. Ct. 231, 78 L. ed. 413, 88 A. L. R. 1481, affirming our decision in 189 Minn. 422, 249 N. W. 334, 86 A. L. R. 1507. See Von Hoffman v. City of Quincy, 4 Wall. (U. S.) 535, 552, 18 L. ed. 403. The obligation of a contract may be impaired by denial of a remedy by judicial action just as effectually as by legislative or executive act. Brinkerhoff-Faris T. & S. Co. v. Hill, 281 U. S. 673, 50 S. Ct. 451, 74 L. ed. 1107; Gelpcke v. City of Dubuque, 1 Wall. (U. S.) 175, 17 L. ed. 520. Compare Chas. Wolff Pkg. Co. v. Court of Ind. Relations, 262 U. S. 522, 43 S. Ct. 630, 67 L. ed. 1103, 27 A. L. R. 1280, holding unconstitutional a statute of Kansas imposing the duty of compulsory arbitration on parties to a labor dispute.

■ There can be no quarrel concerning the views stated by the majority with respect to the rule of *stare decisis*. Substantially the same views were expressed in my dissent in Pattridge v.

Palmer, 201 Minn. 387, 391, 277 N. W. 18. The prior decisions of this court raise a very serious challenge to its professed adherence to those views. They show that the court has declined to submit to the corrective process where there was admitted error. In Pattridge v. Palmer the court refused to overrule Luce v. Clarke, 49 Minn. 356, 51 N. W. 1162, which erroneously construed the statute of limitations. Although the Luce decision was wrong and the court admitted in the Pattridge case that it was, it refused to overrule because the erroneous construction had been acquiesced in for some 45 years. In the instant case there has been a construction of our arbitration statute in Holdridge v. Stowell, *supra,* which has been the accepted rule for some 52 years. If the reasons given in the Pattridge case were valid, there just can be no justification for departing from them now to overrule Holdridge v. Stowell.

But there is this difference between Pattridge v. Palmer and the instant case. In the Pattridge case the prior construction of the statute, which the court declined to overrule, was obviously wrong. The prior construction of the statute in Holdridge v. Stowell, 39 Minn. 360, 40 N. W. 259, is obviously right. In my judgment it simply amounts to this: In the Pattridge case the court declined to overrule a prior erroneous decision, which is an admitted reason for departing from the rule of *stare decisis,* and in the instant case the court overrules a prior decision, which is sound and correct, in which case there should be no departure from, but rather adherence to the rule of *stare decisis.*

It is of utmost importance that the principle controlling the court's adherence to and departure from the rule of *stare decisis* be stated. How otherwise can we, or the bar, or the public predict with any probability what the court will do in the particular case? Diametrically opposite decisions in cases where the same principle should control suggest altogether too much that decision in the particular case is according to judicial caprice rather than juridical principle.

*Stare decisis* aside, this is not a case for a change of construction of the statute for quite another reason. The statute was reënacted without change by R. L. 1905 after the construction placed upon it in Holdridge v. Stowell. The reviser's notes state that the revision of the arbitration statute was "without intentional modification of the law." The reënactment of a statute without change after construction of the statute by the court is an adoption of such construction and gives it the force of law. Christgau v. Woodlawn Cemetery Assn. 208 Minn. 263, 273, 293 N. W. 619, 623; Wenger v. Wenger, 200 Minn. 436, 439, 274 N. W. 517. The judicial construction becomes a part of the statute as if it had been written into it originally. See Roos v. City of Mankato, 199 Minn. 284, 271 N. W. 582.

In conclusion, it seems that if the contract is to be construed as one for an arbitration according to the common law, defendant had the right to refuse to perform subject to liability for plaintiff's damages caused by such breach. In that event, the award below was not binding on defendant and it was entitled to judgment below. If the contract be construed as an executory agreement for a statutory arbitration we have a twofold difficulty. First, defendant is not in default, since it has always been willing to make a submission under the statute. Secondly, an agreement for arbitration of future disputes under the statute is not enforceable and can become binding only by making the submission after the controversy has arisen and then in the form required by the statute. Finally, the contract for submission of the entire controversy to arbitration as a condition precedent to liability is void as against public policy. In any possible view of the case, defendant is entitled to judgment and an affirmance.

GALLAGHER, CHIEF JUSTICE (dissenting).

I agree with the dissent written by Mr. Justice Peterson. I do not believe that the doctrine of Holdridge v. Stowell, 39 Minn. 360, 40 N. W. 259, is bad law or that it should be discarded; nor do I feel that such cases as Gasser v. Sun Fire Office, 42 Minn. 315, 44 N. W. 252; Whitney v. National Masonic Acc. Assn. 52 Minn. 378,

54 N. W. 184; Aaberg v. Minnesota Com'l Men's Assn. 152 Minn. 478, 189 N. W. 434; Abramowitz v. Continental Ins. Co. 170 Minn. 215, 212 N. W. 449; and Glidden Co. v. Retail Hardware Mut. F. Ins. Co. 181 Minn. 518, 233 N. W. 310, 77 A. L. R. 616, should be overruled, particularly when they represent "a prevailing view of decision law elsewhere," as is stated in the majority opinion.

UPON APPLICATION FOR REARGUMENT.

On February 28, 1941, the following opinion was filed:

STONE, JUSTICE.

Respondent's petition for rehearing correctly avers an error of statement for the opportunity to correct which we are grateful. In the third numbered subdivision of the opinion there is reference to a situation which arises when "an earlier policy of decision law is opposed to a later rule declared by statute." We were in error in the assumption that our arbitration statute was later in point of time than the decision in Holdridge v. Stowell, 39 Minn. 360, 40 N. W. 259, and some of the other cases mentioned as in a similar category. That error in no way militates against the result. So the petition is denied.

