## LATTER v. HOLSUM BREAD CO.

No. 6795.   Decided June 19, 1945.   (160 P. 2d 421.)

Rehearing Denied September 7, 1945.

See 17 C. J. S., Contracts, sec. 230; Validity of agreement to submit all future questions to arbitration, note, 135 A. L. R., 79. See, also, 3 Am. Jur., 861.

*Louis H. Callister* and *E. R. Callister, Jr.,* both of Salt Lake City, for appellant.

*Clarence M. Beck* and *Homer Holmgren,* both of Salt Lake City, for respondent.

WADE, Justice.

Plaintiff, Fullmer H. Latter, the business representative of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local Union No. 222, brings this action to recover pay for services rendered between January 1, 1942, and February 15, 1944, by four members of that union. The complaint is in four counts and plaintiff claims the money is owing under the terms of a contract, dated November 7, 1940, between the union and defendant governing the wage scale of the union members. Plaintiff's assignors were driver salesmen. Three of them were in defendant's employment at the time the contract was made and each was at that time receiving nine per cent of all net sales made by him and a guarantee of not less than $30 per week, and in addition thereto one per cent of all net sales made by him over $250. The fourth assignor was not in defendant's employment at the time the contract was made but was employed shortly thereafter and received the same wage scale as the other three.

With the beginning of 1942, defendant refused to pay the extra one per cent on weekly sales over $250, claiming the right to make this reduction under the contract. This action was brought to collect the accumulation of that amount over the period in question. The trial court entered judgment in favor of the plaintiff on the three counts covering wages of the three union members who were in defendant's employment at the time the contract was made but dismissed the other count. Defendant appeals from the part of the judgment against it and plaintiff appeals from the part against him.

The parties base their claims on the following provisions of the contract:

"Section 2. The wages and commissions of all regularly employed salesmen covered by this Agreement shall be nine per cent of all net sales of merchandise sold by him or at any time delivered to customers whom he regularly serves * * * But in no event shall said wages or commissions be less than $30.00 per week. * * *

"Section 4. No employee, by the adoption of this contract, who is now receiving a minimum guarantee in excess of $30.00 per week and 9 per cent on commissions, shall suffer a reduction."

Plaintiff argues that under Section 2 the regular wages and commissions were fixed at nine per cent of net sales and a minimum guarantee of not less than $30 per week and under Section 4 any employee who was at the time of the making of the contract receiving more than that should not be reduced to the scale of Section 2 but would continue on the scale he was then receiving. Defendant does not dispute that construction but contends that the one per cent on sales over $250 was not a part of the wages and commissions but was merely a bonus gratuitously given by the defendant and therefore he could withdraw it any time he wished. There was nothing in the manner of making the payment or of keeping books which supports this contention. The one per cent was paid to the employee at the same time and place and in a lump sum, and was accounted for on the books of the company in exactly the

same manner that the other parts of the wages and commissions were and the trial court found that it was a part of the wages and commissions. In view of these facts it would be an artificial construction to hold that this one per cent was a bonus and we therefore sustain the decision of the trial court thereon.

Plaintiff cross-appealed from the decision of the trial court dismissing the count covering the claim of his assignor who was not in the employment of the defendant when the contract was made. He argues that the contract was made by the union as the collective bargaining agent of the members of the union and that all persons doing the same work should receive the same pay therefor. This argument is well taken but can only have force and effect where there is a contract to be made, and unless it is so provided in this contract we are powerless to do anything about it. Under Section 2 quoted above, the regular wages and commissions were fixed at nine per cent of the net sales and not less than $30 per week. Unless there is some other provision which takes the employee in question out of the provisions of that section, his wages and commission must be in accordance therewith. Section 4, by its express provisions, applies only to an employee who at the time of making the contract was receiving more than the standard rates, and therefore does not apply to this assignor. Nor is there any other provision of the contract which can help plaintiff on this count. The judgment of the trial court must, therefore, be sustained.

Section 14 of the contract contains the following provisions:

"It is agreed that should there be any change or violation of this agreement by any of the parties hereto or any question or interpretation of the meaning of any provision in this agreement which may arise between the parties hereto, an attempt shall be made immediately to settle such controversy amicably. In the event such controversy cannot be amicably settled, it shall be submitted to a board of arbitration which shall consist of two representatives chosen by the company and two representatives chosen by the Union. In the event

that this board of arbitration is unable to reach a decision within seven days then in that event a fifth person shall be chosen by the committee and the decision of such board of arbitration shall be binding on the parties of this agreement; * * *"

Immediately before the commencement of the trial defendant asked permission to file an amended answer wherein he pleaded as a bar to this action the failure of the plaintiff's assignees to submit this dispute to arbitration as provided for in the above quotation. This the trial court refused on the ground that such amendment does not state facts sufficient to constitute a bar to the action. Plaintiff assigns this ruling as error.

It is almost the universal rule that in the absence of a statute to the contrary, an agreement to arbitrate all future disputes thereafter arising under the contract does not constitute a bar to an action on the contract involving such dispute, on the ground that it seeks to deny to the parties judicial remedies and therefore is contrary to public policy. *Johnson* v. *Brinkerhoff*, 89 Utah 530, 57 P. 2d 1132; *Blodgett Company* v. *Bebe Company*, 190 Cal. 665, 214 P. 38, 26 A. L. R. 1070; *McCullough* v. *Clinch-Mitchell Construction Company*, 8 Cir., 71 F. 2d 17; *Gates* v. *Arizona Brewing Company*, 54 Ariz. 266, 95 P. 2d 49; see annotation in 135 A. L. R. 79. Defendant concedes that this is the rule and that we have no statute to the contrary but contends that, notwithstanding the holding of *Gates* v. *Arizona Brewing Company*, supra, to the contrary, in labor cases a different rule should apply. He points out that by Section 49-1-9, U. C. A. 1943 we approved collective bargaining and contends that arbitration is a necessary part thereof. He refers us to an article entitled "The Function of Arbitration" by Philip G. Phillips, 33 Columbia Law Review 1366.

That article does not support defendant's contention. It does not discuss what is or ought to be the common law rule but what is the most desirable statutory policy. It states that the Draft State Arbitration Act authorizes contracts

to arbitrate future disputes and poses the question whether arbitration agreements in labor trade contracts are specifically enforceable and whether statutes should attempt to make them so. The author points out that there are two theories of arbitration: One, that the arbitrators are the agents of the parties and as such are formulating contracts for the parties; the other, that the arbitrators are judges and determine problems of a judicial nature. He concludes that the statutes in question adopt the theory that the arbitrators are performing a judicial function; that ordinarily a labor dispute involves the making of a contract rather than determining the right of parties under a contract and therefore do not present a judicial problem but rather one of conciliation and mediation; and that such matters should be left to boards and commissions rather than to arbitrators authorized to perform judicial functions.

Here we are not concerned with an ordinary labor dispute. There is here no question of formulating a contract or agreeing upon terms. The contract has been made and fully performed by the employees and the only question to be determined is how much money is owing to the employees under its terms. This is purely a judicial question and in no sense one of collective bargaining. There does not appear to be any reason why there should be a different rule in this case and any other case involving the construction of a contract. Whether a new policy shall be established is for the legislature and not for the courts.

The judgment of the trial court is affirmed. Plaintiff shall recover his costs.

LARSON, Chief Justice (concurring).

I agree that the extra 1% commission on sales over $250 was part of the wage scale, and not a bonus. I also agree that by the express terms of the contract the extra 1% commission was not to be paid to drivers coming into such employment after the date the contract was adopted, although I think the Union did not intend that effect. See

*Johnson* v. *Allen*, 108 Utah 148, 158 P. 2d 134. And I agree with the holding that the provision in the contract for arbitration is not a bar to maintaining this action. I therefor concur in affirming the judgment.

WOLFE, Justice (concurring).

It is with great regret that I must concur. Section 104-36-1, U. C. A. 1943, reads as follows:

"Two or more parties may agree in writing to submit to arbitration, in conformity with the provisions of this chapter, any controversy existing between them at the time of the agreement to submit. Such an agreement shall be valid and enforceable, and no party shall have the power to revoke the submission without the consent of the other parties to submission, except upon such grounds as exist at law or in equity for the rescission or revocation of a contract."

By implication the legislature intended to lift the ban, imposed by the common law rule as hereinafter discussed, only in cases of existing disputes.

I am not prepared in the absence of contrary legislation to say that we would or should apply the common law rule, that commercial arbitration contracts are unenforceable because against public policy, to industrial arbitration agreements. Public policy is what the legislature declares it to be. In the field of industrial disputes between labor and management the uniform trend in legislation has been toward the encouragement of collective bargaining. A labor-management agreement encourages labor and management to settle disputes without resort to force. The grievance machinery in these contracts provides for a peaceful means of disposing of future controversies arising under the agreement by arbitration. There is no good reason why such machinery should not be set up in the agreement and used by the parties. The long history of labor disputes indicates a trend away from the courts and a trend toward arbitration and conciliation. The rule adhered to by courts that commercial arbitration agreements are against public policy has long been criticized by the courts, but the rule has been considered too firmly embedded to be overturned without legislation.

A rather complete discussion of the origin and growth of the common law rule against enforcement of arbitration agreements is set forth in *Kulukundis Shipping Co.* v. *Amtorg Trading Corporation*, 2 Cir., 126 F. 2d 978, and in *United State Asphalt Refining Co.* v. *Trinidad Lake Petroleum Co.*, D. C., 222 F. 1006. Both of these cases criticize the common law rule. In *Park Const. Co.* v. *Independent School District*, 209 Minn. 182, 296 N. W. 475, 135 A. L. R. 59, Peterson, J., in a dissenting opinion sets out in detail the arguments usually given in support of the common law rule. This opinion also discusses the early history and development of the rule in England and analyzes the early English cases. Nearly all of the arguments for and against the rule are discussed in these three cases.

The arguments usually given in support of the common law rule are summarized by Hough, J., in *United States Asphalt R. Co.* v. *Trinidad Lake Petroleum Co.*, 222 F. at page 1008, as follows:

"(a) The contract is in its nature revocable.

"(b) Such contracts are against public policy.

"(c) The covenant to refer is but collateral to the main contract, and may be disregarded, leaving the contract keeper to his action for damages for breach of such collateral covenant.

"(d) Any contract tending to wholly oust the courts of jurisdiction violates the spirit of the laws creating the courts, in that it is not competent for private persons either to increase or diminish the statutory juridical power.

"(e) Arbitration may be a condition precedent to suit, and as such valid, if it does not prevent legal action, or seek to determine out of court the general question of liability."

These arguments closely parallel those made by Peterson, J., in his dissent in the *Park Const. Co.* v. *Independent School Dist.* case, supra.

After analyzing the various arguments, Hough, J., concluded:

"Whatever form of statement the rule takes, the foregoing citations show that it always amounts to the same thing, viz.: The

courts will scarcely permit any other body of men to even partially perform judicial work, and will never permit the absorption of all the business growing out of disputes over a contract by any body of arbitrators, unless compelled to such action by statute."

The cases indicate that the hostility of English-speaking courts to arbitration contracts probably originated in the contests of the courts of ancient times for extension of jurisdiction, all of them being opposed to anything that would altogether deprive every one of them of jurisdiction. See Lord Campbell's statement to this effect in *Scott* v. *Avery*, 25 L. J. Ex. 308, 313. Therein Lord Campbell noted:

"The doctrine had its origin in the interests of the judges. There was no disguising the fact that, as formerly, the emoluments of the Judges depended mainly, or almost entirely upon fees, and as they had no fixed salaries, there was great competition to get as much as possible of litigation into Westminister Hall, and a great scramble in Westminister Hall for the division of the spoil. * * * And they had great jealousy of arbitrations whereby Westminister Hall was robbed of those cases which came not into Kings Bench, nor the Common Pleas, nor the Exchequer. Therefore they said that the courts ought not to be ousted of their jurisdiction, and that it was contrary to the policy of the law to do so. That really grew up only subsequently to the time of Lord Coke, and a saying of his was the foundation of the doctrine."

See likewise his comment in the same case in the *House of Lords*, 5 H. L. Cas. 811. In speaking of this origin, Hough, J., in *United States Asphalt Refining Co.* v. *Trinidad Lake Petroleum Company,* stated that

"A more unworthy genesis cannot be imagined."

Perhaps the early historic development of this common law rule is best summed up by the court in *Kulukundis Shipping Co.* v. *Amtorg Trading Corp.*, supra. The opinion is exceptionally well documented. We, omitting the footnotes, quote at length from this opinion [126 F. 2d 982]:

"The English courts, while giving full effect to agreements to submit controversies to arbitration after they had ripened into arbitrators' awards, would—over a long period beginning at the end of the

17th century—do little or nothing to prevent or make irksome the breach of such agreements when they were still executory. Prior to 1687, such a breach could be made costly: a penal bond given to abide the result of an arbitration had a real bite, since a breach of the bond's condition led to a judgment for the amount of the penalty. It was so held in 1609 in *Vynior's Case*, 8 Coke Rep. 81b. To be sure, Coke there, in dictum, citing precedents, dilated on the inherent revocability of the authority given to an arbitrator; such a revocation was not too important, however, if it resulted in a stiff judgment on a penal bond. But the Statute of Fines and Penalties (8 & 9 Wm. III c. 11, s. 8), enacted in 1687, provided that, in an action on any bond given for performance of agreements, while judgment would be entered for the penalty, execution should issue only for the damages actually sustained. Coke's dictum as to revocability, uttered seventy-eight years earlier, now took on a new significance, as it was now held that for breach of an undertaking to arbitrate the damages were only nominal. Recognizing the effect of the impact of this statute on executory arbitration agreements, Parliament, eleven years later, enacted a statute, 9 Wm. III c. 15 (1698), designed to remedy the situation by providing that, if an agreement to arbitrate so provided, it could be made a 'rule of court' (i. e., a court order), in which event it became irrevocable, and one who revoked it would be subject to punishment for contempt of court; but the submission was revocable until such a rule of court had been obtained. This statute, limited in scope, was narrowly construed and was of little help. The ordinary executory arbitration agreement thus lost all real efficacy since it was not specifically enforceable in equity, and was held not to constitute the basis of a plea in bar in, or a stay of, a suit on the original cause of action. In admiralty, the rulings were much the same.

"It has been well said that 'the legal mind must assign some reason in order to decide anything with spiritual quiet.' And so, by way of rationalization, it became fashionable in the middle of the 18th century to say that such agreements were against public policy because they 'oust the jurisdiction' of the courts. But that was a quaint explanation, inasmuch as an award, under an arbitration agreement enforced both at law and in equity, was no less an ouster; and the same was true of releases and covenants not to sue, which were given full effect. Moreover, the agreement to arbitrate was not illegal, since suit could be maintained for its breach. Here was a clear instance of what Holmes called a 'right' to break a contract and to substitute payment of damages for non-performance; as, in this type of case, the damages were only nominal, that 'right' was indeed meaningful.

"An effort has been made to justify this judicial hostility to the

executory arbitration agreement on the ground that arbitrations, if unsupervised by the courts, are undesirable, and that legislation was needed to make possible such supervision. But if that was the reason for unfriendliness to such executory agreements, then the courts should also have refused to aid arbitrations when they ripened into awards, And what the English courts, especially the equity courts, did in other contexts, shows that, if they had had the will, they could have devised means of protecting parties to arbitrations. Instead, they restrictively interpreted successive statutes intended to give effect to executory arbitrations. No similar hostility was displayed by the Scotch courts. Lord Campbell explained the English attitude as due to the desire of the judges, at a time when their salaries came largely from fees, to avoid loss of income. Indignation has been voiced at this suggestion; perhaps it is unjustified. Perhaps the true explanation is the hypnotic power of the phrase, 'oust the jurisdiction.' Give a bad dogma a good name and its bite may become as bad as its bark.

"In 1855, in *Scott* v. *Avery*, 5 H. C. L., 811, the tide seemed to have turned. There it was held that if a policy made an award of damages by arbitrators a condition precedent to a suit on the policy, a failure to submit to arbitration would preclude such a suit, even if the policy left to the arbitrators the consideration of all the elements of liability. But, despite later legislation, the hostility of the English courts to executory arbitrations resumed somewhat after Scott v. Avery, and seems never to have been entirely dissipated.

"That English attitude was largely taken over in the 19th century by most courts in this country. Indeed, in general, they would not go as far as *Scott* v. *Avery*, supra, and continued to use the 'ouster of jurisdiction' concept: An executory agreement to arbitrate would not be given specific performance or furnish the basis of a stay of proceedings on the orginal cause of action. Nor would it be given effect as a plea in bar, except in limited instances, i. e., in the case of an agreement expressly or impliedly making it a condition precedent to litigation that there be an award determining some preliminary question of subsidiary fact upon which any liability was to be contingent. *Hamilton* v. *Liverpool & L. & G. Ins. Co.*, 1890, 136 U. S. 242, 255, 10 S. Ct. 945, 34 L. Ed. 419. In the case of broader executory agreements, no more than nominal damages would be given for a breach.

"Generally speaking, then, the courts of this country were unfriendly to executory arbitration agreements. The lower federal courts, feeling bound to comply with the precedents, nevertheless became critical of this judicial hostility. There were intimations in the Supreme Court that perhaps the old view might be abandoned, but in the cases hinting at that newer attitude the issue was not raised."

In *Johnson* v. *Brinkerhoff*, 89 Utah 530, 57 P. 2d 1132, we affirmed the common law rule relative to commercial arbitration agreements. However, there is no reason to interject that same rule into other fields of the law unless compelled to do so by legislation. We should not hesitate to shake ourselves free from this rule whenever legislation indicates a change in public policy. In the absence of legislation to the contrary, courts should not hold that arbitration of disputes arising out of labor contracts are unenforceable as against public policy.

How then stands the law in this state? The legislature has provided by Section 104-36-1, U. C. A. 1943, that two or more persons may agree to submit to arbitration an existing controversy between them. By this provision the legislature has formulated public policy relative to arbitration agreements. It has expressly approved arbitration of existing disputes. In *Johnson* v. *Brinkerhoff*, supra, 89 Utah 530, 57 P. 2d 1132, we held that the statute did not approve arbitration of future disputes. By providing only for arbitration of "existing" disputes, the legislature has indicated that as a matter of public policy arbitration should be limited to existing disputes. Though the indication is strong throughout labor legislation that the legislature favors arbitration and conciliation, we cannot hold that such indications are so strong as to overcome the specifically implied expression of policy contained in Sec. 104-36-1 expressly relating to arbitration.

Court hostility to arbitration may in the past have had a restrictive influence on the legislature so as to limit the scope of our arbitration statute. It is time that courts generally evidenced a change in attitude to encourage rather than discourage use of arbitration machinery in cases where such machinery is well adapted. As noted in *Audi Vision, Inc.,* v. *RCA Mfg. Co.*, 2 Cir., 136 F. 2d 621, 625, 147 A. L. R. 574,

"The making of recommendations in judicial opinions for statutory changes has distinguished precedent."

Citing L. Hand, J., in *Parke-Davis & Co.* v. *H. K. Mulford Co.*, C. C., 189 F. 95, 116, recommending amendment of the patent law; Judge Hough's opinion in *United States Asphalt Refining Co.* v. *Trinidad Petroleum Co.*, D. C., 222 F. 1006, supra, sharply criticizing the decisions as to arbitration, which aided in procuring the enactment of the Arbitration Act, 9 U. S. C. A. § 1 et seq.; Cardozo, A. Ministry of Justice, 35 Harvard L. Rev., 113; *United States* v. *Mook*, 2 Cir., 125 F. 2d 706. Since as above noted existing legislation in this jurisdiction impels me to the conclusion that the legislature approves the arbitration only of existing disputes and does not favor agreements to arbitrate future disputes, I must reluctantly concur with the holding that the agreement to arbitrate existing disputes cannot be specifically enforced and constitutes no defense to an action for breach of contract.

McDONOUGH, J., concurs in the opinion of Mr. Justice WOLFE.