**W. L. MEAD, Inc.**

v.

**INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, etc. LOCAL UNION
NO. 25, A.F.L.**

**Civ. A. No. 54–797–A.**

United States District Court
D. Massachusetts.

Dec. 2, 1954.

Bernard B. Gould, Boston, Mass, for plaintiff.

Stephen J. D'Arcy, Jr., Boston, Mass., for defendant.

ALDRICH, District Judge.

This is an action brought by the plaintiff, an Ohio corporation, hereinafter called the employer, against the defendant labor organization, hereinafter called the Union, under § 301(a) of the Labor Management Relations Act, 29 U.S.C.A. § 185(a), seeking damages caused by a strike. The plaintiff also asked for a preliminary injunction, which I denied, D.C., 125 F.Supp. 331, affirmed 1 Cir., 217 F.2d 6.

The employer is engaged in the transportation of freight by motor carrier in interstate commerce. As of April, 1953 it entered into a two year contract with the Union on behalf of its employees physically handling the freight by truck or otherwise. On September 8, 1954 the employer "grounded" an employee named Smith, who was a member of the Union, and had been absent from work during August, transferring him from a truck to the loading platform. On the morning of September 10th Smith appeared at the employer's place of business ac-

companied by representatives of the Union and protested this action. An argument developed, at the conclusion of which the Union called all of the employees whom it represented off the job and declared a strike. In spite of numerous efforts to resolve it, this strike is still in progress. Except for the gradual delivery of freight then in its possession, the employer's Boston business has been at a complete standstill since September 10th. The strike spread during the month, so that all business ceased September 30th.

The first question is whether the Union violated the contract by declaring a strike and by picketing the employer's place of business. The agreement provides as follows:

"Should any dispute, grievance or complaint arise during the life of this agreement which the Business Representative fails to adjust, the dispute, grievance or complaint shall be referred to the Arbitration Panel which Panel shall be the exclusive means of adjudicating all matters."

The Union points out that the contract does not contain any specific "no strike" provision. The employer contends that the arbitration clause is to be given that effect.

Manifestly an arbitration clause is not the same thing as a "no strike" clause, and cannot be taken to have such broad consequences. However, it seems to me that it must have some effect of such character. As indicated by Judge Wyzanski in Textile Workers Union v. American Thread Co., D.C.Mass., 113 F.Supp. 137, an arbitration provision would have little meaning if the parties were at liberty to disregard it.

■ The question whether a certain employee named Smith should be put to work at 9 o'clock on a truck, or at 11 o'clock at a lower rate of pay on the loading platform constituted a labor dispute. The Union successfully so maintained at the prior hearing and before the Court of Appeals. At the present hearing before me it stipulated that there was a dispute and that the relative merits of the two opposing contentions were not material to the issue here before us.

■ The Union's refusal to arbitrate this dispute constituted a breach of the agreement. So did the strike. While it is true that declaring a strike never "adjudicates" anything, still the purpose of the strike was to effect a determination of the question without an adjudication. The strike, in other words, was intended to be a substitute for the arbitration procedure. In its argument before me on its motion to dismiss the Union, in discussing the word "adjudicate," stated that an adjudication presupposes an "argument." I find that the calling of the strike by the Union was in fact meant to be an argument of a weighty character, intended to take the place of the argument before the joint committee provided for in the agreement.

The arbitration clause was something less than a no strike provision. I believe that there could be strikes, of which a wildcat strike is an example, which would not constitute a violation of this agreement, but I find and rule that this strike was a violation. This included the picketing, which was part and parcel of the strike.

The parties are in disagreement as to what took place the morning of September tenth. Since both acknowledge that considerable heat was engendered I think this disagreement is due in part to faulty recollection. There is no doubt, however, that a dispute arose over Smith's hours, work and pay; that the employer suggested the matter be referred to the joint committee; that this suggestion was not acceptable to the Union, and that the Union pulled the men off the job, and immediately thereafter started picketing.

The Union says that it stated that morning that there was no joint committee to refer to. The employer says that the Union said "To hell with the joint committee." I am aided in resolving this conflict by a consideration of what took place the afternoon before.

The Arbitration Panel provided by the agreement is a standing panel of seven men, three named by the Union, three named by a large group of employers, of which the plaintiff here is one, who have contracts similar to the one at bar, and a seventh, or impartial arbitrator, agreed on by both sides. The impartial arbitrator is one Judge Coddaire. The other arbitrators may vary from time to time, at the will of the parties whom they represent.

On Thursday, September 9th, the joint committee met to hear a complaint involving the B. & M. Transportation Co. When this case was called the Union arbitrators took the position that the employer arbitrators should be the men who negotiated the contract, and not the arbitrators whom the employers had designated and sent that day. The Union arbitrators asked that the case be postponed for another week so that this request could be complied with. The employer arbitrators did not agree. After considerable discussion the next case was called, at which point the employer arbitrators took the position that if the B. & M. case was not going to be heard they would not hear any other cases that day. The employer arbitrators departed. There is insufficient evidence for me to determine who was right on this occasion and the question is not before me, but I infer that each party felt that the other was very unreasonable. The employer was not concerned with any of the events of September 9th. It had no matter before the committee at that time, nor were any of the employer arbitrators officers or employees of this employer.

I conclude from these events that McCarthy's frame of mind (McCarthy was the Union's business agent who had charge of this case) with reference to the committee, particularly the employer membership of it, was not too good on the morning of September 10th. I have no doubt that he said to hell with it. Furthermore, his actions speak louder than his words.

The Union at the trial sought to explain its position by saying that as of that morning a reference to the committee would have been, in its opinion, a void act, because there was no longer any committee to refer to. It is true that the three employer members sitting on the committee the afternoon before had walked out because of a disagreement with the Union members. Even if it could be thought that the Union members were sufficiently confident of their own future actions, however, it would require clairvoyance on September 10th for them to have had any opinion that three employer representatives—there were ten, in all, available, of whom only three needed to appear—would not convene the following Thursday to conduct business other than the B. & M. Transportation Co. case. It is very possible that the Union that Friday morning was uncertain whether the committee would meet the following Thursday, but it would be naive on my part to suppose that in matters of this character it could be assumed that a settlement of the committee problem could not be effected within the next week, or that the Union was genuinely convinced that it would not be.

Even assuming that the disposition of the Smith matter loomed larger in the eyes of the Union than it does to the court, the recognized procedure for all disputes was for the joint committee to sit only on Thursdays, which meant that nearly every dispute had to await a certain number of days before a hearing could take place. In other words, even if the joint committee had been operating without a hitch, no settlement of the Smith dispute—which on the stipulation of the defendant above referred to I must take to be a bona fide dispute—could have been arbitrated before the following Thursday. I see no reason why this matter could not wait until Thursday, or longer, if necessary. Under these circumstances I must and do find that if the Union on September 10th genuinely wanted arbitration, and

was really fearful that the committee had permanently broken up, the proper response to the employer's request for arbitration would have been, "Perhaps there will be no joint committee sitting next Thursday. If so, can we arbitrate some other way?" Other reasonable alternatives suggest themselves. The alternative selected was not a reasonable one, and the fact that it was selected, together with the rest of the circumstances causes me to find that the Union did not declare a strike because of doubts about the committee, but because of annoyance, directed either at what had taken place the afternoon before, or at what it considered to be the "arrogant" attitude of the employer in rejecting its demands on the subject of Smith.

One primary purpose of an arbitration provision is to prevent the heat of the moment causing just such occurrences from taking place. It is obvious that after such a drastic step has been taken, positions tend to become fixed, and a return to normal may be very difficult. The subsequent history of this case is a perfect illustration of this.

 I do not find the language of this arbitration clause ambiguous. I rule as matter of law that its meaning was that there should be no strike as to any matter appropriate under the agreement to be arbitrated, at least while the employer was not in default as to its own observation of the arbitration requirements. See N. L. R. B. v. Dorsey Trailers, 5 Cir., 179 F.2d 589, 592. I find that the employer was not so in default on September 10th, and that the Union did not then contend that it was. Indeed it did not so contend at the hearing before me. I make this ruling fully recognizing that the burden of showing a limitation of the Union's right to strike is on the employer.

If I am incorrect in this decision it may be appropriate to refer to parol evidence which I heard, reserving my ruling on it, either for the purpose of general construction of the contract, or to resolve ambiguity. The parol evidence does not lead me to any different conclusion from the one I have already reached without it, and on the whole tends to support it. The facts in this regard are as follows:

The agreement which was in existence before the present one was negotiated contained the following clause: "Any dispute that cannot be adjudicated between the employer and the union shall be referred to the General Arbitration Committee, the decision of the Committee to be final and binding on both parties." The Union negotiators proposed a continuation of this clause. The employer negotiators countered with a broad no strike provision. Neither side would make any substantial concession. The Union's position was that the old arbitration clause was sufficient and that while some employers might perhaps be entitled to want a stronger agreement, in this district all relations had been satisfactorily conducted.

I can well imagine that it was a matter of pride and principle that the Union did not want a no strike provision. While I heard considerable testimony that it did not want such a provision, I heard none that the Union specifically wanted to protect its right to strike. The emphasis was the other way—that the arbitration agreement took care of matters. Furthermore, circumstances showed that a wildcat strike might occur without the Union's wishes, and naturally the Union did not want that to effect a breach of its contract.

No doubt the employer negotiators had their own principles, too, and also they did not like wildcat strikes. In some other case or cases there had been such strikes, and the striking employees had then gone to the State Board instead of to the joint panel. Both of these actions were displeasing to the employers.

On all the evidence, if material, I find that the word "exclusive" was incorporated into the present arbitration provision for two purposes. It was to deny the State Board as a means of settling disputes. It was also to prevent

the Union's calling a strike as a means of settling disputes. At the same time the clause did not mean that a wildcat strike would automatically be a breach of contract, and the clause was intended as a compromise which protected arbitration and at the same time kept the objectionable words "no strike" out of the agreement.

In all fairness I must say that I believe in their acceptance of the clause, which was finally drafted by the Massachusetts Commissioner of Labor and Industries, who assisted in the negotiations, the Union negotiators were thinking more about the way the clause differed from a no strike provision, and the employer negotiators were thinking more about the protection which was thrown about the arbitration procedure. That is to say, the parol evidence as to the actual conscious understanding and intention of the parties, as a meeting of the minds, does not leave me with a very firm conviction. As I stated at the outset, the parol evidence which I believe tends in the same direction as the construction which I give the agreement as matter of law, but not very strongly. It tends more in that direction, however, than in the direction of the Union's contention that by omitting the no strike clause it was preserving its full and free right to strike.

Some of the parol evidence I admitted de bene or otherwise I struck out at the conclusion of the testimony on the merits. With respect to parol evidence, stricken or otherwise, I expressly disbelieved the testimony of the witness Norton, so far as it was not directly corroborated by them, as to what Commissioner Johnson or his associate stated in his presence as the reason for, or the meaning and effect of the clause as finally drafted. Nor do I find it to be the fact that Commissioner Johnson stated at any time that this clause permitted any discretion.

The Union having committed a substantial breach of the agreement in pulling the men out, picketing the plant and refusing to supply workers under Article I, this brings me to the question of damages. I will continue the hearing on that aspect of the case at a later date.