UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA, LOCAL UNION 525, LAS VEGAS, NEVADA, APPELLANT, *v.* WILLIAM K. STINE, DOING BUSINESS AS A–1 PLUMBING SUPPLY COMPANY, RESPONDENT.

No. 4241

April 20, 1960

351 P.2d 965

(Petition for rehearing denied June 15, 1960.)

*George Rudiak,* of Las Vegas, for Appellant.

*Morton Galane,* of Las Vegas, and *Harold A. Slane,* of Los Angeles, for Respondent.

190

# OPINION

By the Court, BADT, J.:

Respondent Stine was the successful plaintiff below. The appellant union was defendant. They are referred to as they appeared in the district court or by their respective abbreviated names. Plaintiff sued for damages for defendant's alleged breach of a labor agreement, charging that the defendant union called a work stoppage, destroyed plaintiff's business by depriving him of the assurance that journeymen plumbers would be available to work for him, that his contract jobs were brought to a halt, and that the strike was in violation of provisions of the labor agreement setting forth certain grievance and arbitration machinery. Plaintiff also sought a temporary restraining order and a preliminary and permanent injunction against the strike. Judgment was entered against defendant upon the jury's verdict for $50,000 damages, and the court thereafter denied defendant's motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. Defendant has appealed from the judgment and from these orders.

Allied or associated matters in connection with this situation have heretofore been before this court. Stine and his employee, James D. Ringelberg, had appealed from the trial court's order denying them an injunction pendente lite against the union enjoining the strike. They sought from this court an injunction pending appeal. This we denied. Ringelberg v. United Association of Journeymen, 72 Nev. 156, 297 P.2d 1079. Thereafter the union moved this court for an order assessing damages upon the injunction bond, which Ringelberg and Stine resisted, contending that the proper course of the union was an independent action upon the bond. The

motion that this court assess damages on the injunction bond was based on NRCP Rule 65(c) to the general effect that the surety's liability might be enforced on motion without the necessity of an independent action. We concluded however that the rule did not apply to this court and denied the motion. Ringelberg v. United Association of Journeymen, 73 Nev. 185, 314 P.2d 380. Thereafter counsel for both parties advised the court that the appeal from the court's order denying injunction was moot, and on August 19, 1957 we dismissed that appeal. This however left pending in the district court the suit for damages resulting in the judgment and orders from which the present appeal is taken.

Plaintiff, doing business as A–1 Plumbing Supply Company, had been engaged in that business for a number of years. Some 60 percent of that business resulted from plumbing contracts and some 40 percent from the retail sale of prefabricated plumbing fixtures. It enjoyed a gradual growth to a peak of some $305,000 annual gross sales in 1954, and resulting in a net profit of $31,500 in 1955, with proportionate returns until the strike of April 13, 1956.

About three weeks before the strike of April 13, 1956, according to Stine's testimony, in response to a letter from the union, he appeared before its executive board and Frank Long, its business agent. The witness testified: "There was quite a lengthy discussion as to the tactics or the advertising program that I had put on to operate my business. There was a great deal of criticism on the part of the executive board. * * * Well, I'd been advised at that time by the executive board that if my conduct of business was not changed they would close my shop." This was further explained by Long concerning that meeting: "We were disturbed in the plumbing industry by materials being made and sold to customers. Q. Prefabricated fixtures? A. Now you are talking. Q. Your executive board was concerned with the fact A–1 Plumbing was selling prefabricated fixtures to retail customers? A. We were concerned to a certain extent with any hardware store selling prefabricated materials." It was pursuant to that concern that Stine

was requested to appear before the union's executive board.

Mickey Kern, called by the defendant, a member of the plumbers' union and an executive board member and vice president and later chairman of the board, was present at the meeting of March 21, 1956, and testified that in the Stine matter: "Mr. Stine was advertising plumbing trees for sale. The members of the board felt that this was causing unemployment among the plumbing trade and also it was detrimental to the plumbing industry, so it was discussed and Mr. Stine was asked if he would refrain from this, but Mr. Stine he thought it was actually bringing more work to the plumbing industry rather than harming it." He denied that any member of the board stated that the union would close Stine's shop unless he changed his method of conducting business. It was conceded that the sale of prefabricated plumbing material and the advertising of such material for sale was not a breach of the plumbing contract hereinafter discussed at length.

On April 11, 1956 it was reported to the union that Ringelberg was cutting pipe contrary to the contract. Ringelberg was not a journeyman plumber and was accordingly not permitted to cut pipe. He was employed by Stine as a sales clerk and shop clerk and 75 percent of his time was occupied in this capacity. The union however had given Stine permission to have Ringelberg cut pipe for over-the-counter sales. This service occupied 25 percent of his time.

On the following day, April 12, Long reported this as a breach of the contract and a strike was called for the morning of April 13. That morning no plumbers appeared for work. Stine phoned McKee, managing director of the Federated Employers of Nevada to see what could be done about it. McKee unsuccessfully tried to reach Long by telephone and the latter called back later in the day. A meeting was arranged for 1:30 p. m. that day between McKee and Long. What was said at that meeting is in dispute, but the jury had the right to conclude that the meeting concerned other matters, that

Stine was not present, and that the matter of the strike was not discussed. The first day of the strike, April 13, was a Friday. On the following Monday, April 16, Stine commenced his action for an injunction against the strike and for damages. On April 20, a temporary restraining order was issued and bond thereon filed April 23. The strike lasted seven days. No pickets were posted, there was no violence, and Stine was not placed on "we do not patronize" lists. The case was fully tried on the motion for temporary injunction, which was denied May 3. The strike however was not renewed. On June 8 this court denied an injunction pending appeal.

On September 29, 1956 Stine closed his shop.

In May or June, 1956 Ringelberg left Stine's employment to take employment with the City of Las Vegas, and August 8, 1956 he withdrew as plaintiff in the action.

Defendant's answer denied that the work stoppage violated the obligations of its contract and justified the strike on the asserted ground of plaintiff's breach by his failure to pay health and welfare contributions; by working Ringelberg, not a qualified journeyman, on pipe-cutting machines for contract jobs without journeyman supervision; by employing Ringelberg as a second apprentice at a time plaintiff was entitled to employ only one apprentice and by working Ringelberg and other employees on Saturday without paying the overtime rate.

Defendant first lists a number of separate legal issues revolving about the grievance and arbitration machinery set up in the contract between the employers' association and the union; whether a "no-strike" clause may be implied from the contract provisions; whether there has been a waiver by the parties of the provisions concerning arbitration because those parties have not gone about the business of setting up arbitration machinery; whether the union, in the belief that the employer had violated certain covenants of the agreement, may strike without resorting to the grievance and arbitration machinery; whether despite the calling of a strike by

the union without resorting to agreed arbitration machinery the employer must nonetheless himself resort to such arbitration machinery before seeking damages resulting from the strike; whether the employer thus seeking damages resulting from the strike, thus initiated without the union's attempt to arbitrate, must limit his damages to a time not exceeding the point in which he in turn might have sought arbitration; whether the employer has not rendered the union's repudiation of the agreement nonactionable because he thereafter accepted benefits from the union in furnishing him laborers.

We may for the most part treat these matters together.

The agreement in question is entitled "Labor Agreement," and the parties to the same are Master Plumbers' Assn. of Clark County, Nevada, on the one hand, and the appellant union on the other. The agreement provides that the Master Plumbers' Assn. and the union shall be the bargaining agency for all agreements pertaining to the plumbing, piping, and heating industry in the territory, including Clark County. Stine, like many others similarly situated, had executed a power of attorney authorizing the Master Plumbers' Assn. to act for him and to enter into a collective bargaining agreement with the union, which would be binding upon Stine.

The agreement sets up a permanent joint committee to consist of two representatives from the association and two from the union, with provision for alternates, the removal of the members and alternates, requirement for credentials and filling of vacancies. It provides for organization of the joint committee by election of a chairman and secretary and the manner of voting, and further: "The Committee shall be vested with power to adjust disputes and grievances that may arise, and shall be empowered to interpret and make such rules and regulations as may be necessary to give force and effect to the intent, purpose and meaning of this Agreement. They shall be empowered to have access to all records pertaining to any case where violations of this Agreement are involved. The Committee shall have the power to require all parties to testify under oath before a

Notary Public." The following provision has particular significance: "That for and in consideration of the harmonious relations between the parties referred to and the public, and the maintenance and stability of the conditions of employment and other mutually beneficial relations, *and for the purpose of prevention of strikes and lockouts by facilitating just and peaceful adjustments of disputes and grievances* that may arise from time to time for the purpose of protecting and safeguarding the health and safety of the parties concerned, the parties hereto have agreed that the understanding hereinafter set forth shall be binding on all members of the parties hereto individually and collectively." (Emphasis supplied.)

The agreement reads in part: "It is hereby agreed that the [Master Plumbers'] Association and the union shall be the bargaining agency for all agreements pertaining to * * * the Plumbing * * * Industry."

It further provides that an employer in the plumbing industry is any person who contracts and supplies labor or material. He is required to employ regularly at least one journeyman plumber. A journeyman is defined as a member in good standing of the local union.

The members of the union may work only for employers having a plumbing contract or license and a master plumbing license and carrying Workmen's Compensation Insurance and complying with all of the rules and regulations of the Nevada Industrial Commission. Union members may work only for employers who are parties to the collective bargaining agreement.

Under the title "Board of Arbitration," provision is made for the appointment of two representatives of the union and two representatives of the association as the "Arbitration Board." "When the signatories hereto can not agree voluntarily in extending an agreement as to hours, wages, working conditions, and/or any other contingency that may arise, the dispute may be submitted to the Arbitration Board."

*"In the event of a dispute, both parties to this Agreement will attempt to settle it by a meeting* between the

Union Representative and a Representative of the Plumbing, Heating and Piping Contractors. If no agreement can be reached, the dispute will be referred to the hereinbefore mentioned Joint Committee. If the Committee cannot reach an agreement, it shall be referred to the Board of Arbitration for decision." (Emphasis supplied.)

The arbitration board is required to hear and decide appeals from the joint committee. When the members of the arbitration board cannot agree, they are authorized to select a fifth neutral party. "A decision by a majority of the members of the Arbitration Board shall be accepted as the decision of the said board and shall be binding upon the parties [to the disputes and grievances mentioned in the preamble]."

As noted above, the union, on April 12, called a strike for eight o'clock on the morning of April 13 without presenting its grievance or resorting to any of the contract provisions for submitting the same to arbitration —whether, first, at a meeting between the union representative and a representative of the contractors, or secondly, in failure of reaching an agreement, through the joint committee, or thirdly, in failure of a joint committee agreement, by reference to the board of arbitration.

Appellant first asserts that there was no compulsion upon it to defer a strike without first presenting its grievance and resorting to the arbitration clauses, for the reason that the machinery provided in the agreement for such purpose had not been set up. It should be first noted that Mr. McKee, managing director of the Federated Employers, was Stine's representative throughout the entire period, and Mr. Long, as the business agent, was the representative of the union. The evidence shows that in actual practice any complaint on the part of the association on the one hand or any grievance by the union on the other would be submitted to the cooperation of these two for settlement of the dispute. There is disagreement as to whether the joint committee had actually been set up. Yet it would appear that such a joint

committee did function in June 1956 in the matter of a grievance not related to the present dispute. Mr. Long, the union's business agent, served as a member of the joint committee in that matter. Minutes in evidence indicated that a joint committee had functioned, though it does not appear that a board of arbitration had been selected. The union accordingly justifies the strike without first resorting to arbitration by the fact that neither the joint committee nor the arbitration board was functioning at the time. But the grievance was that of the union. The contract provisions are clear. The union did not, before the strike, submit the grievance to representatives of the two parties. If it had, and if action of the joint committee became necessary, and if that committee had not been activated, the burden was on the union to take some steps to activate it. The same is true if it became necessary for the arbitration board to act. To hold otherwise would deny recognition of the expressed purpose of the arbitration covenants—to preserve "harmonious relations between the parties * * * and for the purpose of prevention of strikes and lockouts by facilitating the just and peaceful adjustments of disputes and grievances that may arise from time to time." See Aircraft Lodge 703, Etc. v. Curtiss-Wright Corp., 169 F.Supp. 837, 841; Structural Steel and Ornamental Iron Ass'n. v. Shopmens Local Union, 172 F.Supp. 354, 360; Cuneo Press, Inc. v. Kokomo Paper Handlers' Union, 7 Cir., 235 F.2d 108.

Appellant further contends that because both parties failed to appoint members of either the joint committee or the arbitration board, the arbitration covenants were waived by both parties. That the parties could waive these provisions is of course true. But the assertion that the recited conduct must be construed as a waiver fails to meet the rule laid down by this court that "the conduct should speak the intention clearly." Reno Realty and Investment Co. v. Hornstein, 72 Nev. 219, 301 P.2d 1051, 1054. The assignment that respondent waived the arbitration provisions of the agreement is without merit.

Appellant contends that the contract included no specific "no-strike" clause, and that, conceding that a no-strike clause may be implied, no such implication arises from the present contract. We find it impossible to agree with this contention. To hold that there is not a clear implication that the respective parties will refrain from enforcing their grievances without first resorting to arbitration would do violence to the many covenants of the agreement above recited. In United Construction Workers v. Haislip Baking Co., 223 F.2d 872, 876, 877, the United States Court of Appeals, Fourth Circuit, in approving an instruction to the jury by the district judge, said: "It is argued that a strike could not constitute a breach of a contract which did not contain a no strike clause; but we think it clear that the purpose of the contract was to require the settlement of disputes and grievances by a procedure which would not cause the disruption of business that would necessarily result from a strike and that a strike without following such procedure was necessarily a breach." W. L. Mead, Inc. v. International Brotherhood of Teamsters, 126 F.Supp. 466.

Despite these conclusions, the union insists that even if it was in violation of the arbitration covenants by calling a strike without resorting to arbitration, Stine was nonetheless likewise bound by those covenants and was in turn bound by his contract to resort to the arbitration machinery before seeking damages resulting from the strike. This contention is supported neither by logic nor authority. "[T]he Union called the strike, without affording the company any opportunity to request arbitration. The Union must bear the sole responsibility for its breach and assume the consequences thereof." Structural Steel and Ornamental Iron Ass'n. v. Shopmens Local Union, 172 F.Supp. 354, 360. "When [the union] struck, the wrong was done and the damage to plaintiff began. Then it was that plaintiff's right of action for damages and injunctive relief to prevent

further damage accrued." Cuneo Press, Inc. v. Kokomo Paper Handlers' Union, 7 Cir., 235 F.2d 108, 111; Aircraft Lodge 703, Etc. v. Curtiss-Wright Corp., D.C., 169 F.Supp. 837, 841.

Appellant contends that respondent had first breached the contract and, having done so, may not, under generally recognized principles of the law of contract, then maintain an action for damages for the subsequent breach of the contract by appellant. In support of this contention, appellant relies on general principles of contract law and upon general principles of labor law to the end that a peaceful strike for a lawful objective (including the compelling of performance by an employer of an agreement made for the benefit of his employees) is now universally recognized. Despite the fact that this contention simply ignores the effectiveness of the arbitration covenants (Shirley-Herman Co. v. International Hod Carriers, Etc., 2 Cir., 182 F.2d 806, 810, 17 A.L.R.2d 609), we may note briefly the asserted breaches of the contract by respondent.

It is first contended that the strike was justified because Stine was delinquent for three monthly payments to the welfare fund. This we may dismiss as trivial. The union had a number of times in the past accepted payments from Stine and others for several months' delinquencies. This particular delinquency had not been called to Stine's attention. Nor need we discuss the charge that Stine's employees had worked on Saturdays without receiving overtime payment. Stine produced and was cross-examined at length with reference to employees' individual time cards. None of these showed any case of failure to pay for overtime. Long admitted that he had no proof of Stine's failure to pay overtime and that his conclusion of Stine's failure to pay overtime arose from rumor. It does not appear that the business agent or other representative of the union called any supposed failure to pay overtime to Stine's attention prior to the strike or that any grievance growing out of such a charge had ever been filed. The union's assertion of a breach by Stine because he had permitted an employee to use his own truck on company business

between shop and job was satisfactorily explained and may be likewise classified as trivial.

Next is asserted Stine's breach of the contract by permitting his employee Ringelberg to cut pipe on contract jobs without journeyman supervision. The evidence is in conflict on this item. A further breach relied upon was the employment of Ringelberg as one apprentice while Stine was employing an additional apprentice. The employment of two apprentices exceeded the permitted ratio of apprentices to journeymen. This alleged breach is in turn predicated on Ringelberg's cutting of pipe for contract jobs, which activity, as noted above, is in dispute. These items were likewise breaches (if proved to be such) that required resort to the filing of a grievance and to the utilization of arbitration. No such resort was had. The arbitration covenants were ignored. This assignment presents no legal ground for reversal.

Appellant contends that the judgment for damages based upon the verdict of the jury must be reversed because, as a matter of law, the plaintiff's pleading and proof failed to establish any claim upon which relief can be granted. This contention is based upon the fact, which may be conceded, that the verdict and judgment, consistent with the pleadings and the proofs, are for damages growing out of defendant's breach of the contract—the work stoppage, the strike, without resorting to the arbitration machinery set up and agreed to by the contract in question. The union's brief says: "Clearly, then, plaintiff's claim is one for breach of contract, or, possibly, for repudiation of the contract." Conceding then that although a labor contract does not contain an express "no-strike" clause, it has been held that the same may be implied where the contract contains machinery for adjustment of disputes through the grievance procedure terminating in arbitration (Lewis v. Benedict Coal Corporation, 6 Cir. (1958), 259, F.2d. 346, and cases therein cited), the rationale of the rule, says the union, presupposes that the arbitration machinery is valid and legally enforcible. It contends, however, that a no-strike clause may be implied only in a jurisdiction

which recognizes such agreement to submit any and all future disputes arising under the agreement to arbitration. This is followed by the contention that Nevada has adopted no such statute but has on the contrary adopted by statute the rule that "The common law of England, so far as it is not repugnant to or in conflict with the Constitution and laws of the United States, or the constitution and laws of this state, shall be the rule of decision in all the courts of this state," NRS 1.030; that under the common law of England agreements to submit any and all future disputes to arbitration are unenforcible; that such is the rule in this country with the exception of ten states and the United States which have enacted special arbitration statutes; that Nevada is not one of such states; that the overwhelming weight of authority is to the effect that the common-law rule must be followed. Appellant's contention relies for support on the annotation contained in 135 A.L.R. 79, under the title "Validity of agreement to submit all future questions to arbitration," which supports the common-law rule by citation of cases from the Supreme Court of the United States (but see Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 923, 1 L.Ed.2d 972) and the courts of last resort of over half of the states of the union, as well as England and Canada. This is indeed a formidable array of authorities. Yet they are not unanimous, and we are impelled by reason and logic, by the fallacies inherent in the common-law doctrine, by reason of the nature of the development of the common law itself and by reason of the inapplicability of the common-law doctrine of unenforcibility of arbitration contracts in this state, as particularly illustrated by the appeal now before us, to adopt the minority view.

It should first be noted that we are not compelled by reason of the statutory adoption of the English common law to apply it in this case. We have heretofore held in the most conclusive language that, despite such statute, we may reject the common law in instances where it

is not applicable to local conditions. Such was the case when we refused to adopt the common-law doctrine of riparian rights. Jones v. Adams, 19 Nev. 78, 87, 6 P. 442, 3 Am.St.Rep. 788 (overruling Vansickle v. Haines, 7 Nev. 249) ; Walsh v. Wallace, 26 Nev. 299, 327, 67 P. 914; Reno Smelting Works v. Stevenson, 20 Nev. 269, 21 P. 317, 4 L.R.A. 60, 19 Am.St.Rep. 364. The last-mentioned case is cited and discussed by the Supreme Court of Oregon in In re Hood River, 114 Ore. 112, 227 P. 1065, 1083. In like manner the Supreme Court of Colorado in Crippen v. White, 28 Colo. 298, 64 P. 184, 186, said: "The law of necessity rendered the common-law doctrine of riparian rights wholly inapplicable in this jurisdiction, and, as has frequently been stated, required its abrogation; so that, notwithstanding the declaration of the statute, it has never been recognized as controlling in the matter of water rights."

In People v. Appraisers, 33 New York 461, as quoted in Boquillas Land & Cattle Co. v. Curtis, 11 Ariz. 128, 89 P. 504, 508, it was said: "It is contrary to the spirit of the common law itself to apply a rule founded on a particular reason to a case when that reason utterly fails." And in the Hood River case, supra, the court said: "The very essence of the common law is flexibility and adaptability * * *. It finds widely different expression in different jurisdictions. If the common law should become so crystallized that its expression must take on the same form wherever the common-law system prevails, irrespective of physical, social, or other conditions peculiar to the locality, it would cease to be the common law of history, and would be an inelastic and arbitrary code. It is one of the established principles of the common law, which has been carried along with its growth, that precedents must yield to the reason of different or modified conditions." Id. 227 P. 1086, 1087.

The two main reasons assigned for holding that covenants for arbitration of all future disputes are unenforcible are that such covenants are contrary to public policy and that they oust the courts of jurisdiction. More logically expressed, this is but one reason—that such covenants are contrary to public policy because they oust the courts of jurisdiction.

The writer of the annotation in 135 A.L.R. at page 91, comments: "As it now stands, the case law in regard to the validity of general arbitration clauses is confused in statement and theory, poorly reasoned, arbitrary, and not well designed to accomplish a useful purpose." The comment is well supported. Note the statement in McCullough v. Clinch-Mitchell Const. Co. (8 Cir. 1934), 71 F.2d 17, 20 (certiorari denied 293 U.S. 582, 55 S.Ct. 96, 79 L.Ed. 678): "It can hardly be said that the decisions as to the validity of provisions in contracts for arbitration of disputes between the parties thereto are in a very satisfactory condition." With reference to the support of the so-called common-law rule on the ground of public policy, it was said in Mogul S.S. Co. v. McGregor, G. & Co. AC (Eng.) 25–HL: "But it has been well said that 'public policy is an unruly horse, and dangerous to ride'; and that 'judges are more to be trusted as interpreters of the law than as expounders of what is called public policy.' "

In some jurisdictions the common-law rule is apparently justified as a means of preventing the arbitration of questions *of law*. However the rule is not so limited, but operates against stipulations to arbitrate future disputed questions where all such questions, including those of fact and law without exception, are to be arbitrated. And it is indicated in other cases that if the stipulation does not embrace *all* future disputed questions, whether of law or fact, there is no clear rule against such a covenant. Some of the cases upheld such covenants which, though broad in themselves, did not include *all* future questions.

The second reason for the rule, that compulsory arbitration is an ouster of the jurisdiction of the courts, does not fare much better in reason. In Chippewa Lumber Co. v. Phenix Ins. Co., 80 Mich. 116, 44 N.W. 1055, 1056, the court notes: "Any person may violate the most solemn contract he has made, but he thereby becomes responsible to the injured party for such violation."

We are disposed to quote with approval the A.L.R. annotator's further comment: "Since there is nothing immoral, or detrimental to the public, in stipulations to arbitrate any and all disputes that may arise between

the parties to a private contract, it seems that the most that can be said in support of the rule against such stipulations is that they are, in general, unwise. But unwisdom is surely a strange ground for the invalidation of contracts." The reported case which is followed by the annotation to which such extensive reference has been made is Park Constr. Co. v. Independent School Dist. No. 32, 209 Minn. 182, 296 N.W. 475, 476, 135 A.L.R. 59. There is, we concede, a distinction in the status of the arbitration. In the case at bar we have a strike called in violation of the arbitration covenants and a judgment for damages resulting from such violation. In the Park Construction case, as defined by the court: "There was actual submission, full hearing, and award. All was the action of competent parties. They got the result intended and for which they had the right to contract. Because of their competence and the lawful nature of both means and end, it would be sheer caprice for us to nullify the whole proceeding." Nevertheless, what the parties intended and accomplished was a common-law arbitration, and thus raised the precise point relied upon in the instant appeal. The lower court had sustained a demurrer to the complaint which sought to recover the award made to the plaintiff in the arbitration. An application of the principle contended for by the union in this appeal would have required an affirmance. The Supreme Court of Minnesota, in the opinion of the court delivered by Stone, J., reversed. Overruling a number of prior Minnesota cases, the court refused to invalidate the covenant providing for arbitration of all future disputes. It dealt, first, with the contention that such executory agreements were void as against public policy. The court said that this contention as to the historical basis for prior holdings is open to serious question. Referring to the much quoted case of Scott v. Avery, 25 L.J. [N.S. Exch.] 308, it quoted the comment of Lord Campbell as "eminent authority" that "the rule was the product of judicial jealousy rather than judicial reasoning" and arose "in the time when 'the emoluments of the judges depended mainly, or almost entirely, upon fees.' In those days they had no fixed salary and so 'there was great competition to get as much as possible of litigation into

Westminster Hall, and a great scramble * * * for the division of the spoil.' In consequence, they had great jealousy of arbitrations * * *. Therefore they said that the Courts ought not to be ousted of their jurisdiction, and that it was contrary to the policy of the law to do so." The court went on to explain that there never was a factual basis for the holding that such agreement ousted the jurisdiction of the courts; that it simply removed a controversy from the arena of litigation; that it was no more an ouster than an agreement of compromise and settlement, or a covenant not to sue; that such agreements simply disposed of issues without litigation; that jury trials even in criminal cases may be waived; that the parties to arbitration simply agreed on the decision of a tribunal of their own choice and erection; and that they had a legal right to erect such tribunal. In overruling five earlier decisions of its own court the Minnesota Supreme Court emphasized that the earlier cases were disapproved [209 Minn. 182, 296 N.W. 478.] "notwithstanding their accord with a prevailing view of decision law elsewhere," and admitted that its decision was contrary to the Restatement of the Law of Contracts. In thus adopting the reasoning of the Minnesota court, we are not unaware of the fact that the Minnesota legislature had enacted arbitration statutes, but the case cited arose not under the statute but under the question of the applicability of the common-law rule.

In Latter v. Holsum Bread Co., 108 Utah 364, 370, 160 P.2d 421, 423, the Supreme Court of Utah rejected as a defense to a suit for additional wages, under a labor contract, the failure of the plaintiff's assignees to submit the dispute to arbitration as provided for in the contract. Wolfe, J., concurred, "with great regret," stating that in the absence of contrary legislation he was not prepared to say that the rule that commercial arbitration contracts are unenforcible because against public policy, should be applied to industrial arbitration agreements.[1] "In the field of industrial disputes between labor

---

[1] The foregoing reference to Judge Wolfe's distinction between arbitration in commercial agreements and arbitration of industrial agreements is clearer in the light of Prof. Williston's discussion of the same subject matter. 6 Williston on Contracts, Revised Ed., p. 5402, § 1930.

and management the uniform trend in legislation has been toward the encouragement of collective bargaining. A labor-management agreement encourages labor and management to settle disputes without resort to force. The grievance machinery in these contracts provides for a peaceful means of disposing of future controversies arising under the agreement by arbitration. There is no good reason why such machinery should not be set up in the agreement and used by the parties. The long history of labor disputes indicates a trend away from the courts and a trend toward arbitration and conciliation. The rule adhered to by courts that commercial arbitration agreements are against public policy has long been criticized by the courts, but the rule has been considered too firmly embedded to be overturned without legislation." Judge Wolfe then refers to the discussion and origin and growth of the common-law rule against enforcement of arbitration agreements in Kulukundis Shipping Co. v. Amtorg Trading Corporation, 2 Cir., 126 F.2d 978, and in United States Asphalt Refining Co. v. Trinidad Lake Petroleum Co., D.C., 222 F. 1006, both of which criticized the common-law rule. The opinion summarizes the reasons for the rule (relying on United States Asphalt Refining Co. v. Trinidad Lake Petroleum Co., supra) as (a) revocability of the contract; (b) that such contracts are against public policy, (c) that the covenant to refer is but collateral to the main contract and may be disregarded, leaving the contract keeper to his action to damages for breach, (d) ouster of the jurisdiction of the courts, and (e) likewise causes such ouster, unless the arbitration is simply a condition precedent to suit.[2] It then thus discusses Lord Campbell's statement

---

[2]Added to the confusion is the addition from time to time in the various cases of reasons other than public policy and the ouster of the courts for the reasons for the common-law rule.

In Utility Workers v. Ohio Power Co., 21 Labor Relations Reference Manual 2308 (1947), 77 N.E.2d 629, the following additional reasons are recited for refusing to enforce arbitrations under the common law: (1) that the arbitrators at common law had no authority to administer oaths or to compel the attendance of witnesses or the production of books, documents or papers; (2) that under the common law, contracts to arbitrate could always be revoked by a party prior to the making of an award; and (3) that the court could not compel the arbitrators to make an award.

in Scott v. Avery quoted above and the comment thereon in United States Asphalt Refining Co. v. Trinidad Lake Petroleum Company that "a more unworthy genesis cannot be imagined." [222 F. 1007.] The opinion then quotes at considerable length from the Kulukundis case, supra. Reference is made to the opinion in that case. Much of it is pertinent to our own holding but is too long to quote. The concurring opinion then refers to an earlier Utah case affirming the common-law rule relative to commercial arbitration agreements and says [108 Utah 364, 370, 160 P.2d 426.] : "However, there is no reason to interject that same rule into other fields of the law unless compelled to do so by legislation. We should not hesitate to shake ourselves free from this rule whenever legislation indicates a change in public policy. In the absence of legislation to the contrary, courts should not hold that arbitration of disputes arising out of labor contracts are unenforceable as against public policy. * * * It is time that courts generally evidenced a change in attitude to encourage rather than discourage use of arbitration machinery in cases where such machinery is well adapted." Justice Wolfe was finally impelled under the rule of stare decisis to uphold earlier decisions of the Utah court upholding the common-law rule.[3] Justice McDonough concurred in the opinion of Justice Wolfe.

Although Oregon has a statute authorizing settlement of future disputes, as well as existing disputes, by arbitration and although in the case next noted the litigation revolved about an executed arbitration award, the court specifically considered and determined the question as to the validity in general of arbitration agreements for the settlement of future disputes. In Rueda v. Union Pacific R. Co., 180 Ore. 133, 175 P.2d 778, 790, the court used the following language: "Consideration of the authorities compels us to repudiate the theory on which the

---

[3]Justice Wolfe was also impelled to concur by reason of the Utah statute U.C.A. 1943, 104–36–1 (in all respects similar to the Nevada statute) authorizing arbitration of existing disputes, but refraining from authorizing arbitration of future disputes. We do not reach the same conclusion as Justice Wolfe that this omission indicated the public policy of the state as approving the common-law rule.

plaintiff has argued his case. The rule that 'parties can not stipulate beforehand to submit their rights generally to the judgment of a designated third party for a final determination' is unsound. The rule that such agreements oust the courts of jurisdiction has an unworthy genesis, is fallacious in reasoning and has been followed merely because of ancient precedent." The court then expressly disapproved the dictum of an earlier case which intimated that agreements making the decision of the arbitrators final and conclusive are void because they oust the courts of jurisdiction. It also rejected the Restatement of the Law of Contracts following the common-law rule as to executory arbitration agreements. It also quoted at length with approval Scott v. Avery, 5 H.L.Cas. 811 (1856), cited above, rejecting the earlier common-law rule and holding definitely that "it would be a most inexpedient encroachment upon the liberty of the subject if he were not allowed to enter into such a contract." Lord Campbell said further in Scott v. Avery: "I can see not the slightest ill consequences that can flow from such an agreement, and I see great advantage that may arise from it. Public policy, therefore, seems to me to require that effect should be given to the contract."

In Local 1111, Etc. v. Allen-Bradley Co., 259 Wis. 609, 49 N.W.2d 720, 723, specific enforcement of an arbitration agreement was denied, the court deciding to adhere to the common-law rule above discussed. It quoted however with sympathy the following: "Many of the courts call such contracts illegal and void, but this characterization has been criticized as wanting in strict accuracy, in view of the authority sustaining enforcement of executed agreements, and other cases which apparently support a right to recover damages in case of breach."

Note that in the Allen-Bradley case it was the union that sought specific performance as against the present situation in which the employer sought damages for breach of the arbitration covenants. This evokes reference to appellant's statement that Stine had breached his covenant to employ only journeymen plumbers in the

cutting of pipe on contract jobs, and that the performance by Stine of this covenant was the quid pro quo for the union's surrender of its proverbial right to strike and to submit to arbitration. This, we think, is not entirely accurate. The quid pro quo for the union's surrender of its right to strike was the employer's surrender of his right to a lockout.

We note further at this point the additional confusion in the application of the common-law rule. Many of the courts in upholding that rule rely on it in denying the right to specific performance or injunction. Some of the cases seem to include "enforcement" by an action for damages for the breach of the covenant. Others would appear to permit an action for damages but to restrict such an action to nominal damages only. Throughout there appears to be confusion in the consideration of the "enforcibility" of arbitration covenants whether in law or in equity. Specific performance and injunction are of course equitable remedies. Action for damages for breach is an action at law. Ordinarily, of course, equitable relief will not be awarded where complete relief by an action at law is available.

To the foregoing we should add the well-recognized trend in this state for a number of years for parties to insert in all manner of contracts clauses whereunder they agree to submit to arbitration all disputes that may arise with reference thereto. The particular contract involved here is a renewal of earlier contracts containing arbitration clauses. And for the most part, nay, almost invariably, these contracts are drawn by expert counsel. Unquestionably such contracts are drawn in good faith with the intention of the parties to carry them out.

We have noted what appears to us to be an ever-increasing trend to depart from or to abrogate the common-law rule, and the reasons for such trend. We think this is apparent too in the constant recurrence of dissenting opinions in the cases where the common-law rule has been upheld. This court does not suffer from the embarrassment of the courts that have felt impelled to bow to stare decisis in their own jurisdictions. In this

state the question is res integra. We heretofore pointedly reserved ·the right to pass on the question. Appellant refers us to In re Mollart, 58 Nev. 329, 337, 65 P.2d 676, 78 P.2d 93, 94, in which we held that Nevada's Uniform Arbitration Act, Laws 1925, ch. 7, secs. 510–534 (dealing with existing controversies), had repealed an earlier act and so held that the later act was the exclusive *statutory* method of arbitration in this state, so that an award under the procedure of the early act was void. The case is not in point as to any of the present issues, but significant is the following statement made by the court: "Something is said in the briefs to the effect that the award is good as a common-law award. As to that, we express no opinion." We are therefore entirely at liberty to consider the uncertain and questionable origin of the common-law rule, the apparent reason behind the rule, the conditions under which the rule was originally enunciated, the question whether those conditions presently exist in this state, whether the original reason or basis for the rule was valid and finally whether we should or should not adopt or reject the rule as applicable or inapplicable to present conditions. For conditions existing in the times of Lord Coke, we can perhaps do no better than refer to Catherine Drinker Bowen's book "The Lion and the Throne." No one can question the vast change since those days or the vast difference in conditions now existing in Nevada without reference to conditions in other states. When the states first adopted the common law of England the population of the United States comprised some eight million inhabitants occupying the Atlantic seaboard. Employment of labor was in its infancy. Industries were confined to a moderate amount of agriculture, raising of cotton and tobacco, a few head of livestock, trapping, fishing, and hunting, some interstate commerce, and like pursuits. The settlement of the west was yet to commence. Today's vast industries were unknown, transportation by steam was to come and virtually to go. The whole great automotive industry (now selling seven million cars a year) was not dreamed

of, nor was the rubber industry or the oil industry, the manufacture of the phonograph, the telephone, radio, television, airplanes and many others, or the incidental industries connected therewith. Many millions of people are engaged in these industries which were not even conceived in the days of the adoption by the original states (and by other states from time to time) of the common law of England, to say nothing of the days of Lord Coke. A half-million union employees are said to be engaged in the steel industry alone. And one need but observe the small number of reports of law and equity cases in the early days as compared with the volumes of reports of the state and federal courts today, or to compare the number of courts and judges of the earlier times with the number of courts and judges of the American courts of today to note the preoccupation of the courts with the disputes presented to them. This is so without even mentioning the many commissions in this country and in this state to which are assigned the determination of issues which would otherwise be submitted to the courts. To this we need only add the disputes in commercial and industrial issues which the courts throughout the nation are daily deciding. Perhaps it is not amiss to refer to the constant and inconsistent suggestions that the thousands upon thousands of personal injury suits that congest our court calendars be submitted to commissions to be created for the purpose. When we superimpose upon these conditions the acknowledged advisability of avoiding industrial warfare, strikes, work stoppages, and lockouts that involve the lives of millions of our population so that harmonious relations may be preserved, that labor may continue uninterruptedly at work and that our vast industries may continue to function without interruption, we should be gravely at fault if we felt that our hands were tied by a common-law rule enunciated 350 years ago, of doubtful justification even then and of confused and uncertain interpretation ever since.

The force of our conclusions may perhaps be illustrated by the following statement contained in the

union's brief: "If plaintiff had abided by the contract and permitted Ringelberg to cut pipe only for over-the-counter sales, there is no reason to believe the strike would have been called." To this we might add: "If defendant had abided by the contract and its business agent Long had called upon defendant's agent McKee to lodge the union's grievance that Ringelberg was cutting pipe for contract jobs, there is no reason to believe that Stine would not have discontinued such practice (if it existed) so that there would have been no occasion for the strike."

We must reject the contention of appellant that the judgment must be reversed because the common-law rule declaring unenforcible agreements for arbitration of future disputes robs the complaint of all force as stating a claim against the defendant.

The union asserts that even if Stine made out a case for damages growing out of the union's work stoppage without resorting first to arbitration, the verdict for damages in the sum of $50,000 was grossly excessive. The item of damages occupied a large proportion of the trial, involved the admission of numerous exhibits, and appellant has devoted a large part of its briefs to the subject. It calls attention to the fact that the strike lasted only seven days in April 1956, and contends that Stine's closing down of his plumbing business in September of that year could not possibly be a direct, natural, and foreseeable result of the seven-day strike in April; that any damages caused directly by the seven-day strike would be restricted to the possible standby costs which, under the evidence, ranged from $300 to a sum not exceeding $2,400; that Stine's closing out of his plumbing business was a voluntary act not caused by any breach of the union's duties under the labor agreement; that in any event Stine made no attempt to sell the business as a going concern, or otherwise to mitigate his damages; that the $50,000 verdict, or such part thereof in excess of $2,400, must stand or fall on the justification of this item as a measure of the value of the good will of his business claimed to have been lost by

reason of the strike. We devote ourselves, as briefly as may be, to these items.

As we read appellant's brief attacking what it characterizes as "this monstrous verdict," appellant's main contention appears to be that it was the result of the court's prejudicial error in admitting testimony, characterized as hearsay, of "reports allegedly made to him by plumbers and general contractors as to the effect of the strike on his ability to obtain journeymen plumbers and to obtain plumbing sub-contracts from general contractors";[4] that it was error for the court to admit the plaintiff's hearsay testimony "that in the fall of 1956 his accountant, a member of a firm of certified public accountants, had placed a valuation of $50,000 on his business";[5] that it was error for the court to admit in evidence a purchase and sale agreement between plaintiff and his superintendent, made about one year before the strike, which provided that in the event of plaintiff's death, the superintendent would purchase plaintiff's business, including the good will and equipment, but

[4]After the objection was made the court ordered: "The testimony is to be allowed not to prove the truth but to prove why the plaintiff did something. The jury is instructed to take this testimony into consideration, whatever Mr. Stine testifies to that somebody else told him may not have been true but that is the reason Mr. Stine did certain things. It is for a limited purpose." The question asked was: "And just for the limited purpose of proving—just state what you did and why you did it, not for the purpose of proving the truth of what he may have told you—would you tell the jury what Mr. McKee reported to you?" Thus limited, the ruling was proper. Las Vegas Sun v. Franklin, 74 Nev. 282, 329 P.2d 867; International Longshoremen's, Etc. v. Juneau Spruce Corp. (9 Cir. 1951), 189 F.2d 177, 191, af'd 342 U.S. 237, 72 S.Ct. 235, 96 L.Ed. 275.

[5]Stine's testimony was in effect that he and his accountant arrived at the figure of $50,000 for the value of the good will. "[This figure] was his opinion as well as my opinion at the time. Q. That you had arrived at after consultation? A. I think around $50,000." Stine's testimony of such concerted action and his testimony of the value of the good will (in essence his *opinion* of the value of the good will) was not incompetent as hearsay because that opinion was formed and was more or less dependent upon the figure arrived at by his accountant from Stine's books and records and communicated by the accountant to Stine. Gulf Refining Co. v. Smith, 164 Ga. 811, 139 S.E. 716, 720; Powers v. Powers, 213 Ga. 461, 99 S.E.2d 818. See also Chaffee v. United States, 18 Wall. 516, 21 L.Ed. 908, 913.

excluding the land and building, for the sum of $50,000.[6] It would appear then that if the evidence thus admitted was competent, relevant, and material and that the objections thereto were properly overruled, the weight to be given thereto and all reasonable inferences to be drawn therefrom were proper subjects for the jury's consideration. We have carefully reviewed appellant's able briefs and oral argument on these issues, as well as other assignments of error in rulings on admissibility of evidence, and have concluded that the court's rulings are free of error. It would add nothing to the body of the law of evidence for us to discuss these in detail, and would serve only to prolong unduly this already too long opinion.

▬▬▬▬▬

We are satisfied that there was substantial evidence to support the jury's verdict of $50,000 damages even if we concede that the jury allocated almost all of this amount to the respondent's loss of the good will of the business. Annual profits over a period of years averaged over $37,000. One expert witness, after allowing a reasonable return on the capital investment and the labor of Stine, concluded that over $11,000 of the annual profit was allocable to good will. Capitalizing this at various percentages, he fixed the value of the good will

---

[6]Defendant's counsel, in cross-examining Stine, secured an admission that by the terms of a written agreement between Stine and one Lewis, the latter was made the beneficiary of an insurance policy on Stine's life—the proceeds, on Stine's death, to go to Lewis to buy the business from Stine's estate. From this the jury might infer that such inducement to Lewis to remain with the plumbing company indicated his importance as a key man, to whom, rather than to Stine, was due the credit of any item of good will. When, on redirect, Stine offered the entire agreement, defendant objected on the ground that the contract had "nothing to do with the issues of this case." The entire contract, however, showed that Lewis could resign whenever he desired, and made no provision that if Lewis should die his estate should in any way profit from the insurance. Such situation, or any other provision that might counteract any persuasive force of the admission, was properly admissible under the general rule. Perrin v. United States (9 Cir. 1909), 169 F. 17, 26. 7 Wigmore on Evidence, 3d Ed., § 2113, pp. 523–528. As to the nature of the objection urged, see State v. Kuhl, 42 Nev. 185, 175 P. 190, 196, 3 A.L.R. 1694.

at from $57,000 to $95,000.[7] The union's expert witness placed a value of $13,000 on the good will, but a number of factors existed that might have caused the jury to discount his minimizing of this value. The jury had before it the full history of the plumbing company, its revenues, costs, and profits, as well as information reflected from its income tax returns over the years, prepared by certified public accountants and other sources. The learned trial judge, in denying the union's motion for judgment notwithstanding the verdict and its alternative motion for a new trial, said: "There is evidence ample to support a verdict ranging anywhere from, the Court recalls from three to four thousand dollars up to as high as seventy to ninety thousand dollars, possibly more. The Court has no way of knowing how the jury arrived at the figure of $50,000."

In Ostertag v. La Mont, 9 Utah 2d 130, 339 P.2d 1022, 1025, the court said: "There is another important factor to consider in determining whether the verdict should be interfered with: that is, the deliberate action of the trial court upon the question of damages in his ruling upon the motion for a new trial. When the trial judge, with his obvious advantages in close contact with the parties and their witnesses has reviewed the situation and given his opinion on the question, it lends some additional verity to the judgment. It will not lightly be disturbed by this court, nor at all unless it is unreasonable in view of the whole record before us."

Both parties rely on Lewis v. Benedict Coal Corporation, 6 Cir., 259 F.2d 346, 352. It supports respondent's main contention that a strike to settle a dispute which a collective bargaining agreement provides shall be settled by an exclusive and obligatory alternative procedure constitutes a violation of the agreement. Appellant relies on that part of the decision and opinion which sets aside an item of damage found by the jury in the sum of $21,000 resulting from a destruction by fire of a certain cable

---

[7]See Standard Oil Co. of Cal. v. Moore (9 Cir. 1957), 251 F.2d 188, 219; Greenwood v. Hotel Employees Alliance, 19 LRRM 2073 (CC Ala. 10th Cir.).

on a construction project which was abandoned after construction was interrupted by the union's strike. The court said: "Clearly this loss, if it be treated as such, is an item of special damages which could not have been within the contemplation of the parties to the contract." In the instant case the jury was specifically instructed: "If the Plaintiff is entitled to damage then recoverable damages include compensation for all injury to the plaintiff's business resulting from the commission of wrongful acts for which the defendant is responsible provided such injury resulted in the natural and usual course of events so that it can fairly and reasonably be said that if the parties had thought about such a breach when the contract was made, loss of such character would have been within their contemplation."

Appellant asserts that the evidence shows that Stine took no steps to mitigate his loss, and that for such reason the $50,000 verdict cannot be sustained. Stine was examined and cross-examined at great length on this point. The jury was properly instructed as to Stine's duty to attempt to mitigate his loss. The question was one for the jury and beyond the scope of our review. Shirley-Herman Co. v. International Hod Carriers, Etc., 2 Cir., 182 F.2d 806, 810, 17 A.L.R.2d 609. The assignment is without merit.

In support of its contention that the closing down of plaintiff's plumbing business in September 1956 could not be a direct, natural, and foreseeable result of the seven-day strike in April of that year, appellant relies on Hadley v. Baxendale, 9 Exch. 341, 156 Eng. Reprint 145, 5 Eng.Rul.Cas. 502; General Magnetic Corp. v. United E. R. & M. W., Etc., 328 Mich. 542, 44 N.W.2d 140; and Lewis v. Benedict Coal Corporation, 6 Cir., 259 F.2d 346. These cases have to do with impropriety of allowance for speculative lost profits, items of damage not reasonably contemplated by the parties under their contract, and similar items under which the law is

undoubtedly correctly stated. These items were likewise properly submitted to the jury under appropriate instructions.

Appellant argues at considerable length that the evidence shows that the closing down of plaintiff's business was the plaintiff's voluntary act and decision caused by the down trend of the construction and plumbing industry in the district and by his own desire to divert his capital and assets to another business enterprise, and was not caused by any breach of appellant's duties under the labor agreement. In support of this argument appellant reviews the testimony at length. Appellant's entire discussion presents, in our opinion, issues of fact that were properly submitted to the jury.

The same is true with reference to appellant's prolonged discussion concerning evidence of an incident under which the union had disciplined three of its members who were plumbers who had worked for Stine. Appellant's contention is that this had to do entirely with the internal workings and procedures of the union and had no proper place in the evidence submitted to the jury. Respondent's theory is that these men were disciplined apparently because they had not reported to the union that Ringelberg was cutting pipe, and that this promoted the diffidence of other plumbers to work for Stine in fear of likewise being disciplined by the union. We do not intend to be drawn into this prolonged argument other than to remark that the situation was relevant to the issue of damages. It too presented questions of fact for the jury's determination.

Appellant discusses a number of other issues involved in the case, but these discussions are, in our opinion, devoted to the contention that the evidence does not support the verdict. In each instance the evidence was in conflict or was such that proper inferences might be drawn by the jury in favor of one of two resulting conclusions. In none of these instances do we feel called upon to interfere with the jury's verdict. An indication of the extent to which we would otherwise have to go

is found in the appellant's request for 24 special interrogatories which however were not given.

Appellant assigns error in the refusal to give several of its requested instructions. For the most part the rejected instructions were embraced in other instructions which correctly stated the law. Other rejected instructions were incomplete as requested and properly refused. The rejection of appellant's special interrogatories was a matter within the discretion of the trial court. 5 Moore's Federal Practice, 2nd Ed., § 49.05, pp. 2217–2218.

Appellant has discussed other matters to which we have given careful attention but which, in our opinion, point to no substantial prejudicial errors, or involve questions of fact submitted to and determined by the jury under substantial evidence supporting the verdict.

The judgment is affirmed with costs.

PIKE, J., and BROWN, District Judge, concur.

McNAMEE, C. J., having disqualified himself, the Governor commissioned Honorable Merwyn H. Brown, District Judge of the Sixth District, to sit in his place.